# UNITED STATES DISTRICT COURT
### for the
### EASTERN DISTRICT OF WISCONSIN

*In the Matter of the Search of*

**4879A S. 27th Street, Greenfield, WI.** This is the location of Nail's Fashion and is more specifically described as a storefront located in a "strip" mall on the west side of South 27th Street between Barnard Avenue and Carpenter Avenue. The building is white with blue trim and a flat roof. The name "Nail's Fashion" appears on a sign above the front windows of the business. The numbers "4879A" appear on the north side of the building above the front door.

**Case Number:** 11-848M (NJ)

## APPLICATION & AFFIDAVIT FOR SEARCH WARRANT

I, Matthew Cooper, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**4879A S. 27th Street, Greenfield, WI.** This is the location of Nail's Fashion and is more specifically described as a storefront located in a "strip" mall on the west side of South 27th Street between Barnard Avenue and Carpenter Avenue. The building is white with blue trim and a flat roof. The name "Nail's Fashion" appears on a sign above the front windows of the business. The numbers "4879A" appear on the north side of the building above the front door.

located in the Eastern District of Wisconsin there is now concealed: **See Attachment A, Items to be Seized.**

The basis for the search warrant under Fed. R. Crim. P. 41(c) is which is (check one or more):

✓ evidence of a crime;
✓ contraband, fruits of a crime, or other items illegally possessed;
✓ property designed for use, intended for use, or used in committing a crime;
❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

Title 21, United States Code, Sections 841(a)(1) and 846.

The application is based on these facts:

✓ Continued on the attached affidavit, which is incorporated by reference.
❏ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature
Name and Title: MATTHEW COOPER, TFO

Sworn to before me, and signed in my presence.

Date: May 23, 2011

City and state: <u>Milwaukee, Wisconsin</u>

_____
Judge's signature
THE HONORABLE NANCY JOSEPH
United States Magistrate Judge
Name & Title of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Matthew Cooper, having been duly sworn under oath, do state as follows:

## I.    TRAINING AND EXPERIENCE

1.    I am employed as a Detective with the Milwaukee Police Department and have been a law enforcement officer for over fourteen years. I have been a Detective for seven years and have been assigned to the Narcotics Division (formerly known as the Organized Crime Division and Vice Control Division) for over six years. I was previously assigned to the Vice Control Division as a police officer for over two years. I have been assigned to the High Intensity Drug Trafficking Area (HIDTA) for over three years. I am also a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA), and have been since October 2008. During this time I have investigated violations of controlled substance laws pursuant to: Title 21, United States Code, Sections 841(a)(1) and 846; Wisconsin State Statutes, Chapter 961; and other related offenses. I have had formal training and have participated in numerous complex drug trafficking investigations, including complex conspiracies and investigations involving Federal wiretaps. I have participated in drug trafficking investigations and associated financial investigations involving large amounts of heroin, cocaine, crack cocaine, marijuana, and/or other controlled substances.

2.    I have participated or assisted in numerous state and federal search warrants for drug trafficking related offenses. These warrants involved the search of locations ranging from residences and businesses of targets, their associates and relatives, "stash houses" (houses used as controlled substance/money storage locations), and storage facilities. Evidence searched for, and recovered, in these locations has included controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments, and various assets that were

1

Case 2:11-mj-00848-NJ    Filed 07/01/11    Page 2 of 76    Document 1

purchased with the proceeds of drug trafficking. I have had numerous discussions with other experienced law enforcement officers, and have conducted and been present at numerous interviews of self admitted drug traffickers and cooperating defendants concerning the manner in which drug traffickers and money launderers operate. In the course of my employment and experience, I have also become aware of techniques and practices used by drug traffickers to avoid detection by law enforcement. Among these techniques are the use of counter surveillance, multiple locations at which to conduct drug trafficking related activities, hidden compartments in vehicles used to hide drugs and currency, the use of pagers, voice mail, cellular telephones, pay phones, email, and the use of numerous associates and "workers" to further their illegal activities. I have also become aware of the various techniques individuals use to conceal the source or nature of drug proceeds. Among the techniques utilized are the purchase of assets and financial instruments in nominee names using cash and "structuring" transactions so as to avoid certain reporting requirements of financial institutions.

3. Based on my training, experience, and participation in drug trafficking and financial investigations involving large amounts of heroin, cocaine, crack cocaine, marijuana, and/or other controlled substances, I know and have observed the following:

  a. I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin, Illinois, and other areas of the United States. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, crack cocaine, and MDMA (Ecstasy). I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances;

  b. I have utilized informants to provide information and evidence when investigating various criminal offenses. Through informant interviews, consensually recorded

2

conversations, and extensive debriefings of individuals involved in criminal activity, I have learned about the manner in which criminal individuals and organizations function in Wisconsin, Illinois, and other areas of the United States. I have also relied upon informants to purchase controlled substances and purchase other evidence;

c.  I have extensive experience conducting both physical and electronic surveillance of individuals engaged in illegal activity. I have participated in the execution of numerous search warrants where controlled substances, money, business records, stolen property, firearms, and records of the illegal activity were seized;

d.  I have extensive experience with individuals who attempt to hide their illegal proceeds by the use of nominees to purchase assets, use of extensive cash purchases, use of cash payment of bills, use of safety deposit boxes, use of trusted associates to store bulk cash, and the use of legitimate businesses to report the illegal profits as legitimate business income.

e.  I know that individuals involved in illegal activities often use electronic equipment, cellular and land line telephones, and the internet to conduct their criminal operations. I know that these individuals often obtain telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required in order to distance themselves from telephones that they use to facilitate their illegal activities. Because these individuals go through many telephone numbers, they often do not pay final bills when they are done using a number and then are unable to put another line in the name of that subscriber.

f.  I have been assigned to numerous investigations which utilized court-authorized interceptions of communications and have been trained to operate the equipment utilized to conduct such operations.

4.  Based on my training, experience, conversations with other agents experienced in sports wagering investigations, and my research of sports wagering activities, I am also aware of the following terms as they relate to sports wagering and this investigation:

a.  Prior to each game, a point spread is established which indicates which team in any particular game is the favorite and which team is the underdog. If, for example, Green Bay is playing Minnesota in NFL Football and the point spread is displayed as "Green Bay, -3, Minnesota +3," that would indicate that Green Bay is favored to win by three points. If a bettor wagered on this game and bet on Green Bay, then Green Bay would have to win by at least 4 points in order for that bettor to win his bet. If Green Bay only won by 2, or Minnesota won, the bettor would lose that bet. If Green Bay wins by 3, the bet is considered a push or

3

tie and there is no win or loss. Some betting organizations or legal sports wagering establishments also take bets on each half of games.

b. Also prior to each game, or each half in some instances, a point total is designated as the "Over/Under" or "Total." In this wager, the bettor is gambling on whether the combined point total for both teams will be over or under the designated total. For example, if the "Total" for the Green Bay vs. Minnesota game was "42" and a bettor placed a bet on the over, the total points scored in the game would have to be at least 43 in order for the bettor to win the bet. If only 40 total points were scored, the bettor would lose. A score of 42 would result in a push.

c. The "money line" for each game is determined before each game or half. This is usually expressed as a negative number, such as "-110" or "-135." What this means is the bettor would have to wager $110 or $135 in order to win $100. This is one of the ways in which the bet taker, a.k.a. "bookie," makes money. It is the commission paid to the bet taker for taking the wager. For each $110 wagered, the bet taker keeps $10 regardless of the outcome. In this investigation, however, case agents have determined that VU and members of the Wisconsin SWO take a 5% commission on all wagers placed.

d. An "If" or "Regular If" bet is essentially two bets placed at the same time. If a bettor were to place a $100 "if" bet on "Green Bay and the Over," that would mean the bettor placed $100 on Green Bay to win by whatever point spread had been established (3 in our previous example). If the bettor wins the first bet, another $100 would be placed on the "Over." If the bettor does not win the first bet of an "If" bet, the second bet is cancelled. If Minnesota won, for example, the bettor would lose the first $100 bet and the "over" bet would be cancelled.

e. A "Reverse" bet is essentially two "If" bets placed at the same time. If a bettor were to place a $100 reverse bet on "Green Bay and the Over," he would be placing the above mentioned "If" bet, but would also be placing $100 on the bet to work in the opposite direction, in this case "The Over and Green Bay." In that instance, if the final point total were 43, the second $100 bet would be placed on Green Bay to win by the point spread. If only 40 points were scored, the second bet would be cancelled. For a $100 "Reverse" bet in the above example with a $110 money line, the maximum risk is $220 and the maximum reward is $400.

5. Based on my training and experience, and on conversations with other experienced law enforcement officers who have participated in drug trafficking, illegal sports wagering, money laundering, and other financial investigations, it is my opinion that:

a. People involved in large scale drug trafficking, sports wagering, and/or money laundering almost always keep records of their transactions. Because drug

4

trafficking and sports wagering generate large sums of cash, it requires the keeping of detailed records as to the distribution of drugs, as well as the laundering of the proceeds. Drug traffickers and money launderers typically keep documents demonstrating the purchase of assets, bank records, and other evidence of the accumulation of wealth through their illegal activities, as well as the methods used to launder the proceeds. Such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the drug proceeds on behalf of the organization. These records, unlike controlled substances, are often maintained for long periods of time, even several years, based on my training and experience. Such records are often maintained under the dominion and control of the drug traffickers and money launderers, and as such, are often kept in their residences, businesses and/or storage facilities;

b. Drug traffickers, sports bettors, and money launderers who amass the proceeds of their enterprise quite often secure their money within secure locations within their dominion and control, often in their residences, businesses, and storage facilities, and often in safes or other secure containers;

c. Large scale drug trafficking, sports wagering, and money laundering activities require the cooperation, association, and communication between and among a number of people within the organization. As a result, people who traffic in controlled substance, participate in illegal sports wagering, or launder money for such organizations will possess documents that identify other members of their organization, such as telephone books, address books, handwritten notations, telephone bills, gambling ledgers, and documents containing lists of names and addresses of criminal associates;

d. Individuals attempting to conceal their illegal activities will frequently place assets obtained with proceeds of criminal activity in the names of friends, relatives, trusted associates, or fictitious entities to avoid detection of these assets by the Internal Revenue Service and other government agencies. Even though these assets are in the names of others, the true owners will continue to exercise dominion and control over the use, ownership, and disposition of these assets;

e. Individuals involved in illegal activities will utilize checking and savings accounts at financial institutions in the names of relatives, friends, trusted associates, or fictitious business entities. These relatives and associates also conduct financial transactions on the individuals' behalf utilizing monetary instruments, including wire transfers of monies into foreign accounts outside the United States;

f. Individuals involved in illegal activities will frequently have some sort of legitimate income or funds and co-mingle their criminal profits with their legitimate funds. This helps conceal the illegal source. Monetary instruments can then be acquired against the funds in the account or a check can simply be written

5

on the account without creating any Currency Transaction Reports (CTRs) or Suspicious Activity Reports (SARs);

g. Individuals involved in illegal activities will frequently allow third parties and/or co-conspirators to make cash deposits to their bank accounts. An individual depositing currency is not typically required to show identification to banking officials, therefore, a third party can go to a bank branch anywhere in the U.S. and deposit cash to an account that is not held in their name. Because the funds are deposited in cash, the account holder, who can be in a different State, can then go to their local bank branch and immediately withdraw the funds in cash. This method of transferring money provides for an almost instantaneous transfer of funds that could not be achieved through the shipping of bulk currency via common carrier and maintains the virtual anonymity of the third party making the deposit which would not be possible if transferring money through a wire service business such as Money Gram or Western Union;

h. Individuals who are attempting to conceal their illegal activities from the IRS and other government agencies commonly hide records that will establish their true ownership of assets. Such records typically include: bank statements, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, automobile titles, property deeds, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices; and

i. Individuals who seek to hide such records typically keep those records in a place that is secure but easily accessible, such as their personal residences, garages, automobiles, storage facilities, safety deposit boxes, briefcases, purses, and safes or security storage containers.

6.    I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

**II.    LOCATIONS TO BE SEARCHED**

7.    This affidavit is submitted in support of applications for search warrants to seek evidence of violations of Title 21, United States Code, Sections 841(a)(1) (possession with the intent to distribute and distribute controlled substances), 846 (conspiracy to possess with the intent to distribute and distribute controlled substances), and 843(b) (use of communications

6

facilities to facilitate controlled substance felonies); and Title 18, United States Code, Sections 1084 (transmission of waging information), 1952 (interstate travel or transportation in aid of racketeering enterprises), 1955 (prohibition illegal gambling business), and 1956 and 1957 (money laundering), for the below listed locations that are associated with the Target Subjects listed below, who have committed, are committing, and will continue to commit the above offenses:

a. **5728 Evarit Drive, Racine, WI**[1]. This is the location of HOA[2] Nguyen's current residence and is more specifically described as a tan and brown brick, two-story, single-family residence with a brown roof located on the north side of Evarit Dr. east of Elwood Dr. The numbers 5728 appear above the garage door on the south side of the building.

b. **40 E. Fieldstone Court. #8, Oak Creek, WI**. This is VU Nguyen's current residence and is more specifically described as a unit within an 8-unit townhome building with gray siding, white trim and a gray roof. The number "40" appears on a blue, diamond-shaped sign in front of the building. Unit #8 is the furthest east unit and is a three-story unit with a garage on the first floor. The number "8" appears on a door on the east side of the building.

c. **5758 Durand Avenue, Racine, WI**. This is the location of Lee Nails salon, a business owned and operated by HOA Nguyen and is more specifically described as a storefront with glass windows located within Regency Mall in Racine, WI. The name "Lee NAILS" appears above the entrance to the business in the mall's interior.

d. **4879A S. 27th Street, Greenfield, WI**. This is the location of Nail's Fashion, a business owned and operated by VU Nguyen and is more specifically described as a storefront located in a "strip" mall on the west side of S. 27th St. between Barnard Av. and Carpenter Av. The building is white with blue trim and a flat roof. The name "Nail's Fashion" appears on a sign above the front windows of the business. The numbers "4879A" appear on the north side of the building above the front door.

e. **1033 N. Old World Third Street, #301, Milwaukee, WI**. This is Sourideth JOE Chansomphou's current residence and is more specifically described as an apartment within a five-story, tan brick building with the bar/restaurant "Tutto" located on the first floor. The numbers "1033" appear on an awning on the east side of the building and on an awning above a door on the west side of the building. The doorbells for

---

[1] Please see Appendix B for a photograph of each requested search location.
[2] Names in caps will be used throughout this affidavit as references to specific targets.

Case 2:11-mj-00848-NJ    Filed 07/01/11    Page 8 of 76    Document 1

the apartments within the building are next to the door on the west side of the building.

8.     Because this affidavit is submitted for the limited purpose of securing authorization to search the above referenced locations, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrants.

## III.     APPLICABLE FEDERAL AND STATE GAMBLING LAWS

### A.  Federal Laws

9.     It is a violation of Title 18, United States Code, Section 1084, the transmission of waging information, if: (1) The defendant was engaged in the business of betting or wagering; (2) The defendant knowingly used a wire communication facility for the transmission: (a) of bets or wagers; or (b) information assisting in the placing of bets and wagers on any sporting event and contest; or (c) of a wire communication which entitles the recipient to receive money or credit as a result of a bet or wager or information assisting in the placing of bets or wagers; and (3) in interstate or foreign commerce.

10.     It is a violation of Title 18, United States Code, Section 1955, prohibition illegal gambling business, if: (1) The defendant conducted, financed, managed, supervised, directed, or owned all or part of a gambling business; and (2) that such gambling business: (a) violated the laws of the state (Wisconsin) in which it was conducted; and (b) involved five or more persons who conducted, financed, managed, supervised, directed, or owned all or part of said illegal gambling business; and (c) has been or remained in substantially continuous operation for more than 30 days, or had a gross revenue of $2,000 or more on any single day.

8

Case 2:11-mj-00848-NJ     Filed 07/01/11     Page 9 of 76     Document 1

## B. State of Wisconsin Laws

11. In pertinent part, pursuant to Wisconsin Statute § 945.02 (Gambling), whoever: (a) makes a bet; or (b) enters or remains in a gambling place with intent to make a bet or to play a gambling machine, is guilty of a Class B misdemeanor.

12. In pertinent part, pursuant to Wisconsin Statute § 945.03 (Commercial gambling), whoever intentionally: (a) participates in the earnings of or for gain operates or permits the operation of a gambling place; or (b) for gain, receives, records or forwards a bet or offer to bet or, with intent to receive, record or forward a bet or offer to bet, possesses facilities to do so; or for gain, becomes a custodian of anything of value bet or offered to be bet; or (c) sets up for use for the purpose of gambling or collects the proceeds of any gambling machine; or (d) for gain, uses a wire communication facility for the transmission or receipt of information assisting in the placing of a bet or offer to bet on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of a bet or offer to bet, in engaged in commercial gambling and is guilty of a Class I felony.

13. In pertinent part, pursuant to Wisconsin Statute § 945.04 (Permitting premises to be used for commercial gambling), whoever intentionally permits any real estate owned or occupied by him or her or under his or her control to be used as a gambling place; or permits a gambling machine to be set up for use for the purpose of gambling in a place under his or her control, is guilty of a Class A misdemeanor.

14. In pertinent part, pursuant to Wisconsin Statute § 945.01, a gambling place is any building or tent, any vehicle (whether self-propelled or not), or any room within any of them, one of whose principal uses is any of the following: making and settling bets; receiving, holding, recording or forwarding bets or offers to bet.

9

## IV. BASIS OF INFORMATION

15. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources: my experience investigating drug trafficking activities; oral and written reports and documents about this investigation that I have received from members of the DEA and other federal and local law enforcement agencies; discussions I have had personally concerning this investigation with experienced narcotics investigators; physical surveillance conducted by the DEA and other federal and local law enforcement agencies, the results of which have been reported to me either directly or indirectly through written reports; public records; and telephone toll records, pen register, trap and trace information, telephone subscriber information; and court authorized monitoring of several cellular telephones.

16. All intercepted communications referenced in this affidavit were made pursuant to court-authorized monitoring which occurred in Seattle, Los Angeles, and Milwaukee pursuant to the court orders listed in Appendix A, which attached to this affidavit. The intercepted communications described throughout this Affidavit have been summarized, and brackets have been placed around language that represent my or other case agents' understanding of what was being said during the communications, based on the content and context of the communications, based on our collective knowledge of the investigation as a whole, prior and subsequent intercepted communications, and my and other law enforcement officers' experience. In addition, language that is quoted from the recorded communications throughout this Affidavit is based upon agents' and officers' review of the recorded communications, and are not intended to be a final transcript of the audio or text recordings from which the quotes are taken. Moreover, the times listed for these communications are approximate. In most cases, voice identifications

10

are based on names used during the intercepted communications, voice recognition that has been accomplished to date by agents and officers, historical information developed during this investigation, telephone subscriber information, and comparison of some of the voices intercepted to voices intercepted during consensually recorded conversations, and/or surveillance by agents and officers. The summaries below do not include all potentially criminal communications intercepted during the period of interceptions, or all statements or topics covered during the recorded communications.

## V. PROBABLE CAUSE

### A. Background of the Investigation

17. On September 5, 2004, a vehicle registered and driven by HOA Nguyen was subjected to an outbound inspection prior to crossing the international border from Blaine, WA into Canada. Approximately $275,235 in U.S. Currency was discovered hidden in the rear wheel well of HOA's vehicle. The seizure of the money was not contested by HOA.

18. In October 2009, DEA case agents in Phoenix, AZ began conducting an investigation into a Mexican drug trafficking organization (DTO) distributing cocaine and methamphetamine. During the Phoenix investigation, case agents identified Drew J. YIM as being a suspected cocaine and marijuana trafficker in the Seattle, WA area associated with several targets of the Phoenix investigation. Phoenix case agents provided information to Seattle case agents who initiated an investigation targeting the DTO in Seattle (Seattle DTO).

19. On December 5, 2009, a vehicle driven by NGHE and travelling southbound on Interstate 5 near Redding, CA was stopped by law enforcement officers for a speeding violation. HOA was the sole passenger in the vehicle. HOA stated that he rented the van and that he was NGHE's brother. The officers asked for and received consent to search the vehicle for drugs,

11

weapons, and/or contraband. During the search, officers located and seized approximately $70,000 in U.S. Currency from luggage in the back of the van and 14 pounds of marijuana (each pound individually wrapped in tape and covered in dryer sheets) in black bags behind the front seats of the van. After being advised of his rights, HOA admitted to officers that he was paid $3,000 to transport the marijuana from Seattle to Los Angeles. HOA stated that two days prior, while working on a rental property in Seattle, HOA was approached by an individual who asked if HOA would take the marijuana to Los Angeles. HOA would not identify the individual and stated his brother, NGHE, did not know about the marijuana. NGHE's WA driver's license listed his residence at 5225 S. 170th Lane in SeaTac, WA. HOA's WI driver's license, listed his address as 5728 Evarit Drive, Racine, WI. Both HOA and NGHE disclaimed ownership of the seized money. Both HOA and NGHE were arrested and released pending the filing of charges in the State of California. HOA currently has an arrest warrant in California for this offense.

20. Since March 2010, Seattle case agents have conducted court-authorized interception of the wire communications over several telephones used by YIM, the leader of the Seattle DTO. The Seattle investigation revealed that HOA Q. Nguyen has been involved with the Seattle DTO in the past as a drug and money courier and that HOA is currently a leader and distributor of marijuana for a Wisconsin DTO. The Seattle investigation further revealed that DUC T. Nguyen, a Canadian citizen in Vancouver, B.C. who uses Canadian telephones, is a marijuana supplier to both the Seattle and Wisconsin DTOs.

21. Since November 1, 2010, court-authorized monitoring of the cellular telephones used by YIM, HOA, and VU Q. Nguyen (HOA's nephew) has confirmed HOA's involvement with the Seattle and Wisconsin DTOs, as well as identifying additional participants in the Wisconsin DTO located in Southeast Wisconsin and Northern Illinois. Court-authorized

12

monitoring has also established that VU Q. Nguyen, HOA's nephew, assists HOA in the operation of the Wisconsin DTO in Southeast Wisconsin and Northern Illinois. Court-authorized monitoring has further established that HOA and VU are involved with AN Nguyen and others in an illegal sports wagering organization (SWO) in Southeast Wisconsin and Northern Illinois.

22.    Information about the Target Subjects listed below comes from the following sources: oral and written reports of other law enforcement officers, court-authorized monitoring of wire and electronic communications, surveillance, and from records, documents, and other evidence obtained during this investigation. Through a review of that information, the following persons and their respective roles in the above referenced illegal activities have been identified as relevant to the requested search warrants and are summarized below:

a. HOA Q. Nguyen (A/M, DOB: 4/15/59) - HOA is supplied large quantities of marijuana by Drew J. YIM, a Seattle-based supplier, and others. HOA resides in Racine, WI. HOA currently oversees all marijuana distribution for the Wisconsin DTO and operates the SWO with the aid of VU and AN Nguyen.

b. VU Q. Nguyen (A/M, DOB: 12/4/82) - VU is the nephew of HOA. VU assists HOA in marijuana distribution and collection of money for the Wisconsin DTO and taking wagers and making payouts for the SWO. VU has also been supplied marijuana by AN Nguyen.

c. AN N. Nguyen (A/M, DOB: 8/31/76) – AN is a Chicago-based marijuana supplier to the Wisconsin DTO and the organizer of a Chicago-based SWO which is also connected to the Wisconsin SWO operated by HOA and VU.

d. JOHN Nguyen (A/M, DOB: 4/23/85) – JOHN is a Chicago-based marijuana distributor who is supplied by AN, the Wisconsin DTO, and others. JOHN is a cousin of AN.

e. Drew J. YIM (A/M, DOB: 9/12/73) – YIM is the leader of the Seattle DTO which supplies marijuana to the Wisconsin DTO. YIM has been the target of a lengthy federal wiretap investigation based in the Seattle area and numerous telephones used by YIM have been monitored over the past several months.

f. DUC T. Nguyen (A/F, DOB: 11/5/63) – DUC is a Canadian-based marijuana supplier for the Seattle and Wisconsin DTOs who has been intercepted using

13

several different Canadian telephone numbers over several Seattle target telephones, as well as telephones used by HOA.

g. PHUC K. Tran (A/M, DOB: 2/20/70) – PHUC is a marijuana grower and supplier based in Northern Illinois who is linked to YIM and the Seattle DTO. PHUC is believed to operate marijuana grow operations in Northern Illinois and coordinates marijuana distribution with HOA in Wisconsin and Illinois.

h. HIEN Tran (A/F, DOB: 6/1/78) – HIEN is the wife of PHUC who has distributed marijuana and collected money for PHUC.

i. Vinh V. TRINH (A/M, DOB 2/2/67) – a Los Angeles area marijuana supplier who distributes high-grade marijuana to Minnesota. AN introduced TRINH to HOA in late 2010 and has since supplied the Wisconsin DTO with marijuana.

j. Tu C. LY (A/F, DOB: 1/1/86) – the fiancé of VU who assists VU in the operation of VU's nail salon, the DTO, and the SWO.

k. HUY Han (A/M, DOB: 1/12/78) – HUY is a courier for the Wisconsin DTO/SWO. HUY and LAI operated AN's SWO for several weeks in early 2011 while AN was out of the country.

l. Thanh K. LAI (A/M, DOB: 04/22/1974) – LAI is a "worker" for AN's Chicago-based SWO. LAI and HUY operated AN's SWO for several weeks in early 2011 while AN was out of the country.

m. SAM V. Huynh (A/M, 10120176) - SAM is a marijuana distributor in the Chicago area who is supplied by the Wisconsin DTO and others. SAM is also believed to be involved in the marijuana grow house operations with PHUC.

n. SOURIDETH JOE CHANSOMPHOU (A/M, DOB: 5/21/73) – JOE is a marijuana distributor in the Milwaukee area who is supplied by the DTO.

**B. PC regarding the Sports Wagering Operation**

23. Since court-authorized monitoring of telephone used by HOA and VU began in November 2010, case agents have intercepted hundreds of calls and text messages indicating HOA and VU's involvement in an illegal Sports Wagering Organization (SWO). The calls and text messages revealed that VU received a daily text message, sometimes multiple text messages, from cellular telephones used and controlled by AN and other members of AN's Chicago-based

14

SWO to a cellular telephone used by VU (MTT18[3]). VU then relayed AN's text message(s) to numerous members of the Wisconsin SWO. The SWO members then called VU to place their bets. Some of the SWO members, referenced as agent bettors, took multiple bets from others and then placed the bets with VU. VU also called AN's SWO and placed his own bets. When case agents first began monitoring, VU received the bets from SWO members and then relayed those bets to HOA, who kept track of the wins/losses. After about December 23, 2010, however, VU stopped relaying the bets to HOA, and VU took over the responsibility for keeping track of the wagers placed by SWO members. Between December 10, 2010 and April 23, 2011, case agents intercepted and monitored over 2,400 pertinent calls and over 3,600 pertinent text messages. The vast majority of these calls and texts related to the SWO.

24. Due to the voluminous nature of these messages, case agents have provided several examples of the manner in which the wagering took place between AN, HOA, VU, AN's associates, and other members of the Wisconsin SWO. The nature of this wagering took place almost every day in a similar manner, depending on the NFL and NCAA football and NBA basketball games that took place each day. In addition, the monitoring to date established that each week, AN, or one of his associates, sent a text message to VU that indicated the total winnings and/or losses for the preceding week. This text message also included money owed for prior marijuana transactions between AN and VU. VU then sent a text message to the individual bettors of the Wisconsin SWO with their respective winnings and/or losses for the preceding week. VU also coordinated the daily and weekly betting with HOA, as well as the weekly win/loss money collection and/or payouts to and from the Wisconsin SWO's bettors.

---

[3] All references to Target Telephones in this affidavit will be abbreviated as follows: Milwaukee Target Telephones will be abbreviated as MTT#, Seattle Target Telephones will be abbreviated as STT#, Los Angeles Target Telephones will be abbreviated LATT#, and Canadian Target Telephones will be abbreviated by CTT#.

15

25. After case agents observed a wagering pattern develop between HOA and VU, they subpoenaed toll records for several of the telephones associated with AN, including MTT20-23 and MTT25-28 and analyzed those records. On November 2, 2010, at 5:30 p.m., telephone records indicate cellular phone number (773) 414-0411 (MTT20)[4] sent an outgoing text message to 19 different phones, including MTT21 (AN). Telephone records indicate that immediately after receiving this text message, MTT21 sent an outgoing text message to (773) 971-8878 (MTT22)[5]. Telephone records indicate that immediately after receiving this text message, MTT22 sent an outgoing text message to 25 different phones, including MTT18 (VU). Telephone records indicate MTT18 (VU) received the incoming text message at 5:30 p.m. and then sent a group text message to the following numbers at 5:33 p.m., many of which then subsequently responded;

| Phone User | Phone Number | Responded back to MTT18 (VU) |
|---|---|---|
| TRAN, Bay | (414) 416-5872 | 5:42 p.m. |
| TRAN, Muoi | (414) 803-3326 | 5:51 p.m. |
| NGUYEN, HOA | (414) 324-7409 | |
| NGUYEN, Dat | (414) 243-2222 | 6:02 p.m. |
| HOANG, Hoang | (414) 467-8027 | 5:54 p.m. |
| HUYNH, Hao | (414) 238-3870 | |
| NGUYEN, Hoang | (312) 799-0361 | 6:05 p.m. |
| TRAN, Vinh | (262) 434-9303 | |
| DANG, Vincent | (414) 702-9619 | 5:56 p.m. |
| CAO, Hai | (262) 501-4199 | |
| OANH, VU | (414) 687-9474 | |
| HUYNH, Phong | (714) 360-4107 | 5:46 p.m. |
| LE, Tan Minh | (414) 736-4238 | |
| DO REAL ESTATE | (414) 552-2164 | 6:04pm |
| PHAN, Tuan (Subscriber) | (414) 364-1995 | 5:48pm |
| TRAN, Tony | (303) 669-4896 | 5:53pm |

[4] MTT20 is subscribed to Thu T. HUA, a 61 year old female, at 5638 N. Bernard St., #1, Chicago, IL.
[5] MTT22 is subscribed to Anh VO at 4878 N. Broadway St., Chicago. Telephone records also indicate another number believed to be involved in the SWO, (773) 971-8989 (MTT23), is also subscribed to VO at this address. Other than telephone records, case agents have been unable to locate any other source linking the name Anh VO to 4878 N. Broadway St. Public records indicate 4878 N. Broadway St. is the address for Tic Tac Nail and Beauty Supply, a business within a few blocks of Lee Nails Supply, 1102 W. Argyle St., Chicago, IL, a business linked to AN. Based on the investigation to date, case agents believe Anh VO is a nominee intended to hide the identity of the true user of MTT21 and MTT22.

16

*Case agents believed the mass text messages that were transmitted between phones identified above contained the "odds" or betting lines for the games taking place on a particular day and time. This "odds" information is used by the bettors to assist them in determining which wagers they want to place on the sporting event, a violation of Title 18, USC, Section 1084.*

26.     At 6:09 p.m., VU (MTT18) called HOA (MTT13) and case agents monitored the following conversation:

HOA:   HELLO.
VU:    [U/I]
HOA:   YES. OKAY.
VU:    MIDDLE TENNESSEE 10. *$1,000 bet on Middle Tennessee to win by 3.*
HOA:   TENNESSEE 10. OKAY.
VU:    HIGH 6. *$600 bet that at least 58 points are scored.*
HOA:   OKAY.
VU:    MIDDLE TENNESSEE + HIGH 3 REVERSE. *A $300 bet on Middle Tennessee to win by at least 3. If that bet wins, then a $300 bet will be placed on the "High" or "Over". If Middle Tennessee did not win by more than 3, the second bet was cancelled. Since this is a reverse bet, the bettor is also placing a $300 wager that at least 58 total points are scored. If that bet wins, then a $300 bet would be placed on Middle Tennessee to win by more than 3)*
HOA:   TENNESSEE + HIGH 3...OKAY.
VU:    UH...
HOA:   NONE FOR FIRST HALF?
VU:    FIRST HALF...WAIT...THERE'S ONLY ONE FOR FIRST HALF. ARKANSAS STATE + LOW 3 REVERSE, FIRST HALF. *In this case, the bets are only being placed on the first half of the game. The actual spread and total for this game is unknown. For demonstration purposes, the point spread will be Middle Tennessee -3, Arkansas State +3, and the total will be 29. This means that Middle Tennessee would have to win the first half by at least 3 if a bet was placed on them and that there would have to be more than 29 total points scored in the first half for an over bet to win. A $300 bet on Arkansas State to win the first half or lose the first half by less than 3 points. If that bet wins, then a second $300 bet would be placed that fewer than 29 total points would be scored in the first half.*
HOA:   WHAT?
VU:    ARKANSAS STATE + LOW 3 DOLLARS REVERSE, FIRST HALF.
HOA:   ARKANSAS?
VU:    YES.
HOA:   PLUS...
VU:    LOW 3 DOLLARS REVERSE.
HOA:   OKAY 3 DOLLARS REVERSE. OKAY.
VU:    FIRST HALF.
HOA:   OKAY, FIRST HALF.
VU:    OKAY BYE.
HOA:   OKAY.

17

27. According to public sources, Arkansas State played Middle Tennessee in NCAA college football that evening. The results of the game were: Arkansas State 51 and Middle Tennessee 24. Public sources indicate the point spread was Middle Tennessee -3, Arkansas State +3. The "Over/Under" was 57.5. *Case agents believe HOA and VU use the terms "High" and "Low" to replace "Over" and "Under," respectively.* Public source s indicate the first half score of that game was 10-7 in favor of Arkansas State. The final score was 51-24 in favor of Arkansas St. *Based on those scores, the results of the four (4) bets placed by VU identified above would be: (1) Middle Tennessee 10 - lost by the bettor and HOA and VU profit $1,000; (2) High 6 - won by bettor and HOA and VU lost $600; (3) Middle Tennessee + High, 3 dollar, reverse - In the first half of the reverse bet, the bettor lost the Middle Tennessee bet, therefore the second bet was cancelled and HOA and VU won $300. In the second reverse bet, the "High" bet was won and HOA and VU lose $300. The second half of the reverse bet results in a $300 bet then placed on Middle Tennessee, which lost and HOA and VU won $300. The total result of the reverse bet is a gain of $300 for HOA and VU; and (4) first half $300 reverse bet on Arkansas State plus the Low - The first half of the first reverse bet, Arkansas State, was won by the bettor resulting in a $300 loss by HOA and VU. Since this bet won, a $300 bet was placed on the low. This bet also won, resulting in a $300 loss by HOA and VU. Both of the reverse bets also won, resulting in another $600 loss by HOA and VU, or a total loss of $1,200 for that first half reverse bet. The total result of the series of bets placed by VU would result in a loss of $500 for HOA and VU (commissions not included).*

28. On November 15, 2010, at 10:14 p.m., AN (MTT21) called HOA (MTT12), asked HOA if HOA would do AN a favor and stated "I lost a lot in ball game. I can't bear it. I already quit. I already closed the line...but I still have on the website...I'm stuck this week. I

18

can't move around. Can you help me about 50 cents?" HOA responded by saying he would call VU and another guy the next day to check. AN told HOA not to tell anyone because he had to protect his reputation to keep doing business. *Case agents believe AN told HOA he lost a lot of money gambling and needed a $50,000 loan from HOA. AN wanted to keep his dilemma a secret in order to continue doing business in the SWO.*

29. At 11:24 p.m., VU (MTT19) called HOA (MTT13) and told HOA that AN got in trouble with gambling and got "bruised to a hundred (lost $100,000)." VU said AN might close his online gambling for a couple weeks. HOA told VU that AN called HOA earlier asking to borrow "50 cents" ($50,000) from HOA and to keep it as secret to preserve AN's reputation. They decided to loan AN money so AN's reputation was not hurt. VU believed if AN's reputation was damaged; it may hurt HOA and VU's business (SWO). HOA told VU that AN asked him for "50 cents" ($50,000) but HOA didn't have a lot of money available. VU said AN borrowed $10,000 a few weeks earlier and paid it back right away. HOA said he would go to talk to AN the next day.

30. On November 23, 2010, at 3:41 p.m., HOA (MTT13) called VU (MTT18) and told him he was coming to see VU. VU told HOA to bring the "papers" (money) and asked if HOA knew the total yet. HOA said only in general and they would check it again when they got together. *Case agents believe HOA and VU were discussing the amounts won and lost in sports wagers for the previous week.* At 4:37 p.m., surveillance observed HOA arrive at Nail's Fashion, 4879A S. 27th St., Greenfield, WI, driving his black Toyota Camry. HOA and VU were observed meeting inside of the business. At about 5:17 p.m., HOA left the business, entered his Camry and left the area. At 5:37 p.m., HOA (MTT13) called VU (MTT18) and told him to "take that thing and put it away." At 7:17 p.m., VU (MTT18) called HOA (MTT13) and told him "The

19

total is "Fourteen Two". HOA told VU he was busy and the call ended. *Case agents believe when HOA told VU to "take that thing and put it away" he was telling VU to put a sample of marijuana away so no one else would see it. During the later call, case agents believe the reference to "Fourteen Two" is a reference to the amount of money that HOA and VU each lost during that weeks wagering. That amount is detailed in the next paragraph.*

31. On November 24, 2010, at 10:28 a.m., VU (MTT18) called HOA (MTT13). HOA asked VU about the numbers from the day before. VU told HOA "14,200. Each person." VU then told HOA the daily wins and losses for wagers the week before. *Altogether, HOA and VU lost $28,400 that week; or $14,200 each.* HOA told VU he would bring VU the money if he was free that afternoon.

32. At 10:40 p.m., HOA (MTT13) called VU (MTT18). HOA and VU discussed not giving money to AN right away for AN's gambling debt. They are worried that AN had lost so much money he will not be able to pay if they have another losing week at wagering. HOA told VU the bettors can't always be as lucky as they have been and things will get better. Eventually, HOA and VU agree not to give money to AN yet.

33. On December 26, 2010, at 11:35 a.m., VU (MTT18) received a text message from MTT28, a phone associated with AN and his SWO. The text message read: Mia–4/41.5; Jack–7/45; Stl–2/40; Ne–3/35.5; Ball–4/39.5; and Kc–4/42.5. Public sources revealed the following games were played during the first series of NFL Football games that day: Miami Dolphins vs. Detroit Lions, Jacksonville Jaguars vs. Washington Redskins, St. Louis Rams vs. San Francisco 49ers, New England Patriots vs. Buffalo Bills, Baltimore Ravens vs. Cleveland Browns, and Kansas City Chiefs vs. Tennessee Titans. Case agents interpreted the text message as follows: Mia – 4/41.5 (Miami favored by 4 with an over of 41.5); Jack – 7/45 (Jacksonville favored by 7

20

with an over of 45); Stl – 2/40 (St. Louis favored by 2 with an over of 40); Ne – 3/35.5 (New England favored by 3 with an over of 35.5); Ball – 4/39.5 (Baltimore favored by 4 with an over of 39.5); and Kc – 4/42.5 (Kansas City favored by 4 with an over of 42.5). At 11:36 a.m., VU (MTT18) sent the same text message he had received from AN to 16 different phones. At 11:39 p.m., VU (MTT18) began receiving incoming phone calls from many of the same phone numbers he sent the text message to. As illustrated below, many of the SWO members placed bets with VU:

| Time | Number connected to MTT18 | User | Wager |
|---|---|---|---|
| 11:39 a.m. | (414) 736-4238 | Tan Minh Le | "$Ten on Washington …Chicago 10". |
| 11:44 a.m. | (262) 488-0765 (Text) | Tien Nguyen | "Jac 1. Jac plus over 1. Ne 2. Ne plus over 3. Bal 3." |
| 11:46 a.m. | (414) 803-3326 | Muoi Tran | "Low Buffalo 3. Miami 3. Add the two guys together $2 St. Louis $3." |
| 11:47 a.m. | (414) 364-1995 | Kevin Ho | "K.C. 5. Washington 5. Under for Ram 3. Over for K.C. 3. Baltimore 3.New England 3. K.C. plus Washington 2. Detroit plus Washington 2. N.E. 1. Miami 1. New England low 2. High on Ram 1. Jet 3. Buffalo 3. Washington 3. Cleveland 3." |
| 11:49 a.m. | (414) 687-9474 | Vu Oanh | "High for Ram $1. Kansas $1. Kansas plus high 50 cents. Baltimore plus low 50 cents. $1 low for New England." |
| 11:55 a.m. | (303) 669-4896 | Tony Tran | "$35 on Detroit. 10 on Jets. Over 15 (on Jets). 3 parlay on those two. 15 on Buffalo. Under 15 (on Buffalo). $3 parlay on them. 35 on Baltimore. 10 on Chicago. $3 parlay on Jacksonville and Chicago. $3 parlay on Baltimore and Detroit. $3 parlay on Jacksonville and Detroit." |
| 11:55 a.m. | (262) 488-0765 (Text) | Tien Nguyen | "Bal plus over 1." |
| 11:56 a.m. | (414) 467-8027 | Hoang Hoang | "Detroit $15. 20 on Buffalo. 20 on Washington. $4 on KC. $3 on Chicago. 4 on Miami. 3 over on Rams. 3 on Miami plus Chicago. 3 on over Rams plus Chicago. 2 on over Rams plus KC. 2 on over Rams plus Cleveland. 2 on Chicago plus Cleveland. $3 Rams over plus Chicago." |

21

| | | | |
|---|---|---|---|
| 11:59 a.m. | (414) 801-1290 | Laura Phan | "Ram plus Jet 15. |
| 12:00 p.m. | (414) 491-3130 | Alain Tran | "High for San Franc plus Miami plus low of Washington plus Baltimore. 4 50 cents." |
| 12:02 p.m. | (773) 219-8616 (MTT27) | Unknown (Believed to be AN) | (VU placed bets) "Washington. Chicago 30. Baltimore 60. High of Baltimore plus Miami $15. High of Miami 10." |
| 12:04 p.m. | (414) 380-4335 | Khanh Lam | "Low Miami 7. Jacksonville 6. Chicago 3. K.C. 10. Baltimore 20." |
| 12:05 p.m. | (714) 878-8899 | Bao Huynh | "Ram $2. Baltimore 2. The two added together $1. Detroit $2. High for Ram $2. |

34. On this date, December 26, 2010, VU did not call HOA to place the bets. *Case agents believe VU kept track of the wagers himself and they were relayed to HOA at a later time.* Public sources reveal the following results from NFL games played that day: Miami Dolphin 27, Detroit Lions 34; Jacksonville Jaguars 17, Washington Redskins 20; St. Louis Rams 25, San Francisco 49ers 17; New England Patriots 34, Buffalo Bills 3; Baltimore Ravens 20, Cleveland Browns 10; and Kansas City Chiefs 34, Tennessee Titans 14. *The results of wagers placed with VU according to the point spread and over transmitted in the text messages would be as follows: Mia–4/41.5 (Miami lost and the over won); Jack–7/45 (Jacksonville lost and the over lost); Stl–2/40 (St Louis. won and the over won); Ne–3/35.5 (New England won and the over won); Ball–4/39.5 (Baltimore won and the over lost); and Kc–4/42.5 (Kansas City won and the over won).*

35. On December 29, 2010, at 12:41 a.m., VU (MTT18) received an incoming text message from MTT27, a phone used by AN and his SWO. The text message read: NFL +2135; NBA -5150; 13002 -2020; OLD +8130; TOTAL +3095. *Case agents believe AN was telling VU in the above text that during the previous weeks wagering, VU won $2,315 on NFL Football games, lost $5,150 on NBA Basketball games and lost $2,020 on unidentified wagers for a total weekly loss of $5,035. During previous weeks, VU had won $8,130 leaving VU with a net profit of $3,095 going forward.*

22

36. On January 4, 2011, at 3:16 p.m., VU (**MTT18**) began sending text messages to members of the SWO indicating the results of the members' wagers for the previous week. The text messages read as follow:

| Number | User | Message | Interpretation |
|---|---|---|---|
| 414-687-9474 | Vu Oanh | Total -525 | Lost $525 |
| 414-803-3326 | Muoi Tran | Total +880 last week +400 total +1280 | Won $880 and had won $400 the previous week Net gain $1,280 |
| 714-360-4107 | Phong Huynh | Total this week -10650 | Lost $10,650 |
| 414-702-9619 | Vincent Dang | Total +290 | Won $290 |
| 414-736-4238 | Tan Minh Le | Total -4120 Old 2000 2120 | Lost $4,120 this week, but won $2,000 other weeks. Total - Net loss $2,120 |
| 303-669-7896 | Tony Tran | Total -4910 | Lost $4,190 |
| 414-801-1290 | Laura Phan | Total -10355 | Lost $10,355 |
| 714-878-8899 | Bao Huynh | Total -400 | Lost $400 |
| 414-380-4335 | Khanh Lam | Total +22326 | Won $22,326 |
| 414-467-8027 | Hoang Hoang | Total +7910 | Won $7,910 |
| 414-364-1995 | Kevin Ho | Total -50 | Lost $50 |
| 414-238-3870 | Hao Huynh | Total -1090 | Lost $1,090 |
| 312-799-361 | Hoang Hoang | Total $15,600 | Won $15,600 |

*Based on wagers placed by members of the SWO and the resulting wins and losses over the previous week, case agents believe that members of the SWO won $14,906 from HOA and VU.*

37. On January 6, 2010, at 12:18 p.m., AN (MTT21) called VU (MTT18) and told him "I have the Fat Guy go." *Case agents believe AN was sending "the Fat Guy" to pick up money from VU[6].* At 12:55 p.m., (773) 251-8888 (HUY) called VU (MTT18) and told him "I'm coming up." VU asked HUY to wait a half hour and said "Have about 70 ($70,000). I'm waiting for one more guy." HUY told VU he would wait with him. Surveillance later observed HUY[7] arrive at VU's business, Nail's Fashion, 4879A S. 27th St., Greenfield, WI, driving a white

---

[6] Case agents had previously intercepted a text message believed to be from AN (MTT28) to VU (MTT18) on January 4, 2011. The message read "NFL -109180, NBA +1500, 13002 –1005, OLD +3095, THANH +2500, TOTAL -106180." *Case agents believe this was the result of wagers VU had placed with AN over the previous week and past debts won by VU and debts owed to THANH. Case agents believe VU owed AN $106,180.*
[7] *Case agents identified HUY after viewing his Illinois driver's license photo.*

23

2006 Lexus. HUY and VU went to meet one of VU's sports wagering customers and then had lunch before returning to Nail's Fashion. HUY and VU went inside. After about one minute, HUY exited the business carrying a black and orange bag which appeared to be heavily weighted. Surveillance followed HUY back to Chicago where they observed HUY's vehicle parked next to 1102 W. Argyle St., the location of AN's business, Lee Nails Supply[8]. Case agents believe HUY picked up the money from VU for AN, transported it back to Chicago and delivered it to AN. At 4:09 p.m., AN (MTT21) called VU (**MTT18**). VU told AN "I send you 85 ($85,000)…As for the other, can you give me another 2-3 days. AN Agreed. *Case agents believe VU told AN he was only able to send him $85,000, but he would have the rest of the money in two or three days.*

38.     On January 13, 2011, at 11:41 a.m., VU (MTT18) received an incoming call from (414) 708-7137, a phone later identified as being used by Binh Nguyen (BINH). VU (MTT18) had previously spoken to BINH about paying BINH the money he owed to him. BINH asked VU what time VU would have "it" (money) available and VU replied "About two hours." BINH told VU that "the guy" already arrived and VU said "It was supposed to be One, Two O'clock." BINH said it was, but BIHN has "to pay the portion that I lost." Case agents believe VU and BINH were paying gambling debts to another bookmaker who had come to collect. VU told BINH he still had to collect some money and told BINH "Wait a moment, because they went to get early in the morning to give to me". BINH told VU "Let me see if Jimmy could wait because Jimmy is afraid to wait because it's a large amount of money. He afraid to get stopped." BINH

---

[8] On January 6, 2011, while meeting with VU, one of VU's gambling customers called MTT18 and spoke to HUY. The customer asked HUY if he remodeled nail salons and HUY directed the caller to LEENAILSUPPLY.COM and stated he worked there.

24

asked how much money VU had and VU replied "I have a few tens ($10,000) here. I'm still waiting for two more guys to come by and I will have enough." VU then told BINH he would have "Over 20 ($20,000), around 30 ($30,000)" available. VU said he would call back after collecting more money. BINH told VU that "Jimmy" was waiting at the Pho 27 restaurant, 4756 S. 27th St., Milwaukee.

39. At 12:15 p.m., VU (MTT18) called (262) 412-7050, a phone subscribed to Tuyet Nguyen, HOA's wife. VU asked if Tuyet was "at the shop (Lee Nail Salon, 5758 Durand Ave., Racine, WI). She said she was. VU asked Tuyet "Do you have $5,000 there? Could I borrow? I'll give it back on Tuesday...Because I have to pay the bookie guy." Tuyet agreed to loan the money to VU. Positional tracking of MTT18 at 12:40 p.m. revealed VU was in close proximity to Lee Nail Salon, 5758 Durand Av., Racine, WI. *Case agents believe VU asked Tuyet to borrow $5,000 to pay BINH. He then went to Lee Nail Salon and picked up the money.*

40. Surveillance observed a black BMW X5 registered to BINH in the parking lot of Pho 27 and also observed a white Toyota Prius with Illinois license plate H827982 parked in the lot. The Prius was registered to Kiem Nguyen. From 12:38 p.m. to 12:45 p.m., there were four text messages back and forth between BINH (414-708-7137) and VU (MTT18). During these messages, BINH asked for VU's location and VU said he would be back in 20 minutes. Surveillance units observed BINH and a subject later identified as Jimmy HO (HO) exit Pho 27. BINH entered the BMW and HO entered the Toyota. A few minutes later, HO entered the passenger seat of the BMW. At 12:56 p.m., BINH (414-708-7137) called VU (MTT18). VU asked where "Jimmy" was and BINH said he was at Pho 27. VU asked if "Jimmy" could meet at Exit 333 on the way back to Chicago. BINH said ok and asked how much money VU had. VU said he would call back. A few seconds later, VU (MTT18) called BINH (414-708-7137) and

25

told him "28 ($28,000)." BINH said he would have "Jimmy" call VU. BINH and HO then exited the BMW and entered the restaurant. A few seconds later, BINH, HO and a subject identified as Kiem Nguyen exited the restaurant. BINH entered the BMW and left the area. HO entered the driver's seat of the Toyota and Kiem Nguyen entered the passenger seat.

41. Surveillance followed the Toyota south toward Chicago. At 1:05 p.m., BINH (414-708-7137) called VU (MTT18). BINH gave VU Jimmy's phone number of (920) 316-0209. VU (MTT18) then called (920) 316-0209. VU and "Jimmy" agreed to meet at a gas station near Exit 333. At 1:21 p.m., the Toyota exited I-94 at Exit 333. At 1:27 p.m., VU arrived at the gas station in his black Lexus and met with HO and Kiem NGUYEN next to the Toyota. VU and HO then entered VU's Lexus. A few minutes later, HO exited the Lexus, entered the Toyota and drove out of the area. At 1:53 p.m., VU (MTT18) called BINH (414-708-7137) and told him he had given HO "28 ($28,000)." BINH said "I can calculate the book with him." *Case agents believe BINH would arrange to erase VU's debt from HO's gambling book.*

42. Surveillance followed the Toyota south on I-94 and notified the Wisconsin State Patrol. A Wisconsin State Trooper conducted a traffic stop of the Toyota for following an unsafe distance from another vehicle and for having an illegal license plate bracket. HO and Kiem Nguyen gave conflicting stories as to the purpose for their trip and appeared nervous. At the request of the Trooper, a narcotics K-9 was deployed on the vehicle. The K-9 alerted to the presence of controlled substances inside the vehicle. During a search of the vehicle, the Trooper recovered three envelopes containing $28,000 from the center console and a bag containing $100,000 from the glove compartment. HO stated he was going to use the money to purchase a nail salon in Milwaukee. Kiem Nguyen stated the money belonged to HO and was being used to open a nail salon in Milwaukee. The Trooper seized the $128,000 and released HO and Kiem

26

Nguyen. *Case agents believe the $28,000 recovered from the vehicle was used by VU to pay a gambling debt to HO and the $100,000 was the gambling debt BINH had paid to HO.*

43. On January 31, 2011, at 6:58 p.m., VU (**MTT18**) received an incoming text message from AN (MTT28). The text message read: NBA +13430; 13002 -1256; TOTAL +12175; OLD -17880; 6X42 -25200; MAP 25000; GRAND -5900. *Case agents believe AN was telling VU in the above text that during the previous week, VU won $13,430 on NBA Basketball games and lost $1,256 on unidentified wagers for a total weekly gain of $12,175. As a result of previous weeks wagering and marijuana purchases from AN, VU still owed $17,880 to AN. VU also purchased six more pounds of marijuana from AN for $4,200 per pound ($25,200). VU had previously paid AN $25,000 (MAP=Money Already Paid)[9]. The net result, therefore is that VU still owed AN $5,900.*

44. On February 23, 2011, at 10:24 a.m., MTT38, the phone used by AN's SWO, sent a text message to VU (MTT18) which read "13000 -520; 13011 -2300; Phone -4892; Total - 7712." *Case agents believe the text message contained VU's gambling losses for the previous week. VU lost $520 and $2,300 on undetermined wagers, and $4,892 on wagers placed over the phone for a total loss of $7,712.*

45. On February 24, 2011, at 2:20 p.m., VU (MTT18) called HUY (MTT26) and told him "In a little while HOANG (Nguyen) will give you five seven one zero ($5,710)...Please put in two ($2,000) more and then give to L.T.[10] for me." HUY asked "Two?" VU said "It was

---

[9] Previous phone calls between VU and AN indicated that on January 27, 2011, VU is believed to have given $18,000 to HUY Han to be deliver to AN as payment for marijuana. In addition, VU gave $7,000 to "Thanh" in Milwaukee to pay a debt AN owed to "Thanh." AN told VU he would give VU $25,000 credit for the two payments.

[10] Case agents believe L.T. is a nickname of Thanh LAI. On January 6, 2011, case agents conducting surveillance near AN's business, Lee Nails Supply, 1102 W. Argyle St., Chicago, IL, observed a silver 2005 Range Rover,

27

twenty-three ($2,300), right? So just put in two ($2,000)…and then give to L.T. for me." HUY agreed. *Case agents are aware that VU had contacted HOANG Nguyen earlier that day and asked HOANG to give $5,710 to HUY so VU didn't have to drive to Chicago. Agents believe VU then called HUY and told him HOANG would give HUY the $5,710 later that day. VU also asked HUY to add $2,000 to that money and give it all to LAI. This would complete VU's payment of his $7,712 gambling debt.*

46. On March 16, 2011, at 5:44 p.m., VU (**MTT18**) received two incoming text messages from HUY (MTT38). The first text message read: close 6:00; Atl -2/20.5; Close 6:20 p.m.; Det -4.5/07; Bos -10.5/94.5; Orl -6/82; NO -4.5/96.5; Mia -6/02.5; Uta -6/10; Sac -9.5/14.5; Dal -. The second text message read: 3.5/11.5; LAC .1/97.5. *Case agents believe the second text message was simply a continuation of the first. Due to the length of the message, the phone automatically split it into two separate messages.* Public sources revealed the following games were played in NBA Basketball that evening: Denver Nuggets at Atlanta Hawks, Toronto Raptors at Detroit Pistons, Indiana Pacers at Boston Celtics, Orlando Magic at Milwaukee Bucks, Phoenix Suns at New Orleans Hornets, Oklahoma City Thunder at Miami Heat, Minnesota Timberwolves at Utah Jazz, Cleveland Cavaliers at Sacramento Kings, Dallas Mavericks at Golden State Warriors, and Philadelphia 76ers at Los Angeles Clippers. *Case agents interpreted the text message as follows: close 6:00 (The following bet closes at 6:00 p.m.); Atl-2/20.5 (Atlanta favored by 2 points. The Over is 220.5); Close 6:20 p.m. (The following bets close at 6:20 p.m.); Det-4.5/07 (Detroit favored by 4.5. Over is 207);Bos-10.5/94.5 (Boston favored by 10.5. Over is 194.5); Orl-6/82 (Orlando favored by 6. Over is*

---

bearing Illinois Fire Fighter license plate LTLTL, parked in a parking lot around the corner from the business. The vehicle was registered to Thanh LAI. The previous owner was AN.

Case 2:11-mj-00848-NJ    Filed 07/01/11    Page 29 of 76    Document 1

*182); NO-4.5/96.5 (New Orleans favored by 4.5. Over is 196.5); Mia-6/02.5 (Miami favored by 6. Over is 202.5); Uta-6/10 (Utah favored by 6. Over is 210); Sac-9.5/14.5 (Sacramento favored by 9.5. Over is 214.5); Dal-3.5/11.5 (Dallas favored by 3.5. Over is 211.5); LAC-1/97.5. (LA Clippers favored by 1. Over is 197.5).* At 5:46 p.m., VU (MTT18) sent the same two text messages he received from HUY to seven different phones. At 5:50 p.m., VU (MTT18) began receiving incoming phone calls from many of the same phone numbers he sent the text message to. As illustrated below, many of the SWO members placed multiple bets, including multiple bets for the same game, with VU:

| Time | Number connected to **MTT18** | Phone User | Wager |
|------|------------------------------|------------|-------|
| 5:51 p.m. | Incoming from (414) 708-7137 | Binh Nguyen | "Denver 2"…"High 2"…"Together 1"… "Denver Plus Boston 2"…"Boston plus High Denver 1"…"Boston plus high 1". |
| 6:00 p.m. | Incoming from (773) 680-3333 (MTT38) | HUY | High Indy 30…Low Sacramento 20… "Combined 10 action"…"Orlando 20"… "Saca (Sacramento) 20"…"Combined 10 action"…"Houston plus High 10 action". [Case agents believe HUY returned VU's call and VU was placing this wager with HUY] |
| 6:03 p.m. | Incoming from (303) 669-4896 | Tony Tran | "Atlanta 5"…"Over 5"…"Both added together 2". |
| 6:09 p.m. | Outgoing to (773) 680-3333 (MTT38) | HUY | "Low Detroit 10"…High Philadelphia 10.. "Combined 10 action". [VU placing more bets with HUY] |
| 6:11 p.m. | Outgoing text to (414) 708-7137 confirming Binh's wager. | Binh Nguyen | "Den 20; Over 20; Den+over 10r; Den+bos 20r; Bos +over den 10r; Bos +over 10r." |
| 6:26 p.m. | Incoming from (773) 680-3333 (MTT38) confirming VU's wager | HUY | "High Indy 30, low of Saca (Sacramento) 20, Combined 10 action, Orlando 20, Saca (Sacramento) 20, Combined 10 action, Houston plus high 10 action, low of Detroit 10, High of Phila(delphia) 10, Combined 10 action." |
| 6:31 p.m. | Incoming from (414) 380-4335 | Khanh Lam | "Boston 10"…"High of Miami 10"… "Sacramento 3"…"High of Clippers 3". |
| 6:51 p.m. | Incoming from (714) 360-4107 | Phong Huynh | "Miami 3"…"High of Miami 3"… "Milwaukee 3". |
| 6:55 p.m. | Incoming from (303) 669-4896 | Tony Tran | "Milwaukee 5"…"Over of NO 5".. "Both together 3"…"Miami 5"… "Milwaukee plus Miami 2". |
| 6:56 p.m. | Outgoing to (714) 360-4107 confirming the user's wager | Phong Huynh | Mia (mi) 3"…"High 3"…"Milwaukee 3". |

29

Case 2:11-mj-00848-NJ    Filed 07/01/11    Page 30 of 76    Document 1

| | | | |
|---|---|---|---|
| 7:15 p.m. | Outgoing to (414) 380-4335 confirming Khanh's wager | Khanh Lam | "Boston 10, High of Miami 10, Sacramento 3, High of Clippers 3". |
| 9:11 p.m. | Incoming from (414) 380-4335 | Khanh Lam | "Dallas 8"…"High 8"…"Bet 8 dollars on Saca (Sacramento)". |
| 9:12 p.m. | Outgoing to (414) 380-4335 confirming Khanh's wager | Khanh Lam | "Dallas 8, High 8, Saca (Sacramento) 8". |
| 9:28 p.m. | Incoming from (303) 669-4896 | Tony Tran | "Under Golden State 10". |

42. Public sources reveal the following results from NBA games played that evening: Denver Nuggets 102, Atlanta Hawks 87; Toronto Raptors 93, Detroit Pistons 107; Indiana Pacers 80,Boston Celtics 92; Orlando Magic 93, Milwaukee Bucks 89; Phoenix Suns 95, New Orleans Hornets 100; Oklahoma City Thunder 96, Miami Heat 85; Minnesota Timberwolves 104, Utah Jazz 119; Cleveland Cavaliers 97, Sacramento Kings 93, Dallas Mavericks 112, Golden State Warriors 106; and Philadelphia 76ers 104, LA Clippers 94. *The results of wagers placed with VU according to the point spread and Over transmitted in the text messages would be as follows: Atl-2/20.5 (Atlanta lost and the over lost); Det-4.5/07 (Detroit won and the over lost); Bos-10.5/94.5 (Boston lost and the over lost); Orl-6/82 (Orlando lost and the over pushed); NO-4.5/96.5 (New Orleans won and the over lost); Mia -6/02.5 (Miami lost and the over lost); Uta-6/10 (Utah won and the over won); Sac-9.5/14.5 (Sacramento lost and the over lost); Dal-3.5/11.5 (Dallas won and the over won); and LAC-1/97.5 (Clippers lost and the over won).*

43. On March 15, 2011, and March 16, 2011, VU (MTT18) sent text messages to members of the SWO indicating the results of the members' wagers for the previous week. The text messages read as follow:

| Number | Phone User | Message | Interpretation |
|---|---|---|---|
| 303-669-7896 | Tony Tran | "Total -5250" | Lost $5,250 |
| 414-380-4335 | Khanh Lam | "Total +5084" | Won $5,084 |
| 773 251-8888 | HUY | "This week -1450" | Lost $1,450. |
| 714-360-4107 | Phong Huynh | "Total +1115" | Won $1,115 |
| 414-803-3326 | Muoi Tran | "Total -490. Last week | Lost $490 this week. |

30

Case 2:11-mj-00848-NJ     Filed 07/01/11     Page 31 of 76     Document 1

| | | +215. total -275." | Won 215 last week. Total loss $275. |
|---|---|---|---|
| 414-736-4238 | Tan Minh Le | "Total -5355. Last week -395. Total 5750". | Lost $5,355 this week lost $395 last week. – Total loss $5,750 |
| 414-708-7137 | Binh Nguyen | "Total +66800" | Won $66,800. |

*Based on wagers placed by members of the SWO and the resulting wins and losses over the previous week, case agents believe that members of the SWO won $60,454 from HOA and VU this week. Including previous weeks' wagers, HOA and VU lost $60,274 to SWO members. In addition, because of the multiple conflicting bets on the same game placed by the bettors identified above, case agents believe these bettors are placing bets for other unknown individuals with VU and SWO.*

44.     On March 25, 2011, at 8:50 p.m., VU (MTT18) called AN (MTT21). VU asked if AN could call "Brother Do[11]"? AN said he had called Do already and told VU he would call him again and tell Do to meet VU at a Milwaukee restaurant. During a series of calls over about the next 45 minutes, VU and Do agreed to meet. At 9:35 p.m., VU (MTT18) called his fiancée, Tu LY, and asked where the check was. LY told VU there were two checks on the table, a green one and underneath it, the black one. She told VU to take the whole thing. Positional tracking of MTT18 revealed that VU was in close proximity to Nail's Fashion, VU and LY's business. At 10:20 p.m., VU (MTT18) called AN (MTT21). Positional tracking of MTT18 revealed VU was now in close proximity to his residence, 40 E. Fieldstone Cr. #8, Oak Creek, WI. VU told AN "Brother Do gave me twelve ($12,0000)...Now I'm going (to Chicago)." AN thanked VU. He and VU discussed VU's wagers from earlier. At 11:22 p.m., VU (MTT18) called AN (MTT21). An asked if VU wanted to meet at "Hoang's Pool Hall". *Case agents are aware that HOANG Nguyen owns the Billiards 1000 pool hall located at 2711 W. Lawrence Ave., Chicago, IL.* VU

---

[11] Case agents believe this is Do Nguyen, a Milwaukee resident who is a bettor in AN's SWO.

31

agreed to meet AN there.   Positional tracking of MTT18 revealed VU was in close proximity to Billiards 1000 at 11:52 p.m.   *Case agents believe AN asked VU to pick up money from Do Nguyen, which was payment of a gambling debt from Do to AN, and deliver the money to AN in Chicago.  Vu met with DO and received $12,000.  VU then picked up two checks from Nail's Fashion which he was using to pay his own gambling debt to AN.  VU drove first to his residence and then to Chicago, met AN at Billiards 1000 and gave AN the money he had received from Do as well as two checks for his own gambling debt.*

45.     On April 15, 2011, at 1:05 p.m., AN (MTT21) called VU (MTT18).  AN told VU "Three of them (checks) bounced.  The two five thousand ($5,000) bounced too."  VU asked if both checks bounced and AN replied "All three checks bounced."  VU said he thought the other two had been cashed already.  AN told VU "Collect all the money and tomorrow morning I have delivery to Milwaukee and I'll stop by to get it from you too."  VU said he would call back. *Case agents believe VU bounced three checks totaling $16,000 which were given to AN as payment for gambling debts.  AN told VU to collect the money and AN would pick it up from him the next day.*   At 1:15 p.m., VU (MTT18) called AN (MTT21).  VU told AN the other two checks (two $5,000 checks) had been cashed already.  AN told VU "This morning my friend said they're bounced." *Case agents believe AN had given the checks to someone else to cash and the checks had bounced.*  VU told AN he would get the money and have it for AN the next day.  On April 16, 2011, at 3:05 p.m., HUY (MTT38) called VU (MTT18) and told him he was on his way to meet VU (to pick up the money).  VU agreed.

46.     On April 18, 2011 at 1:41 p.m., AN (MTT21) called VU (MTT18).  AN told VU "There's a check of Tu Ly…Seven Thousand Dollars ($7,000).  It bounced.  VU asked which check and AN told him "The check 1334.  Tu Ly…The date is April 12."  Vu told AN that check

32

had been written a long time ago.  AN repeated to VU the check had bounced.  VU acknowledged AN.  *Case agents subpoenaed Tu LY's JP Morgan Chase Bank checking account and located check number 1334.  The check, dated April 12, 2011 was written for $7,000 and made payable to Phuong Nguy.  The payee name and date appeared to be in a different handwriting from the rest of the check.  Agents believe VU had Tu LY write the check, but leave the name and date blank.  VU then gave the check to AN who could fill in the name of whoever he gave the check to and whatever date they wanted to cash the check.  The following checks in sequence, 1335 and 1336, were dated March 31, 2011 and April 1, 2011, respectively, both dates prior to that written on Check 1334.*

47.    On April 18, 2011, at 8:47 p.m., MTT38, the phone used by AN's SWO, sent a text message to VU (MTT18) which read "Call -17375; 13002 -4490; Old -6000; Check -7000, Total -34865".  *Case agents believe the text message contained VU's gambling losses from the previous week.  VU lost $17,375 on wagers placed over the phone, $4,490 on undetermined wagers, owed $6,000 for past losses, and owed $7,000 for the bounced check for a total or $34,865 owed to AN's SWO.*

48.    Court-authorized monitoring of the cellular telephones used by HOA and VU ended on April 23, 2011.  Since that time, telephone records for the above identified telephones used to facilitate the illegal sports wagering operations indicate that the betting pattern established between November 1, 2010 and April 23, 2011, has continued up to the date of the submission of this affidavit.  *Case agents believe the above text messages, telephone calls, and telephone data demonstrate that HOA, VU, AN, HUY, LAI, and the others involved in the SWO are violating the target offenses by using MTT18 to transmit wagering information between their cellular phones both in the form of text messages and phone calls.  Since HUY and other*

33

*members operate in the Chicago area, while VU and others in the Wisconsin SWO operate in Wisconsin, case agents believe that HUY, VU and others participate in interstate travel in furtherance of these offenses.*

### C. PC regarding the Drug Trafficking Organization

49.     On July 26, 2010, at 10:40 a.m. (PDT), HOA (MTT1) called YIM (STT21) and asked YIM if YIM sent over the "food" (marijuana). YIM told HOA they were getting ready (to ship the marijuana), probably by the end of the week.  HOA told YIM he wanted to collect the "papers" (money).  At 8:36 p.m. (PDT), YIM (STT21) called HOA (MTT1) and told HOA that YIM is not 100% sure when the marijuana will be delivered to HOA and that it could be early the following week.  HOA replied "…I want to collect all the paper (money) over here too." YIM told HOA "Well it's always you never see your paper (money).  The food (marijuana) go but you never see the paper." *Case agents believe YIM and HOA were talking about "fronting" marijuana to customers and not being able to collect money that is owed to them.*

50.     On July 28, 2010, at 9:55 a.m. (PDT), YIM (STT21) called HOA (MTT1) and told HOA "I'm gonna send the food (marijuana) today" and then says "…They (couriers) come to you."  YIM told HOA "I think they see you tomorrow."  Later in the call, YIM told HOA "I see one point, one point two table?"  YIM then corrected himself and said "Oh no, 12 table. The 4…the 4 table is, um, that that the young guy (PHUC)."  HOA then asked YIM "Total 12 Table?" (120 pounds of marijuana for HOA) and YIM responds "Yes sir!" *Case agents believe members of the Seattle and Wisconsin DTOs use the term "table" to refer to 10 pound quantities of marijuana and that YIM was discussing an additional 40 pounds of that marijuana that was being delivered to another customer (PHUC).*

34

51. At 12:23 p.m. (PDT), YIM (STT21) called HOA (MTT1). During this call, YIM and HOA discussed in detail the money owed for previous marijuana deliveries and money to be paid to couriers for transporting the marijuana. YIM told HOA their profit from the last delivery was $43,700. YIM also said that they owe the "horse" (courier) $9,375. YIM went on in the call to say "That leaves a profit of $34,325." YIM stated that he divided this profit into thirds with 1/3 going to himself, 1/3 going to HOA and 1/3 going to DUC. YIM said each 1/3 would then be worth about $11,440. YIM repeated the pricing information to HOA from the previous call and they confirmed they owe $178,400 for the last shipment of 75 pounds of marijuana and they made $222,100 for selling the marijuana, resulting in a profit of about $43,700.

52. On July 29, 2010, court-authorized positional tracking of MTT1 (HOA) indicated that between 11:15 p.m. and 11:30 p.m. (CDT), MTT1 was travelling from HOA's residence in Racine, WI, north on Interstate 94. Between 11:45 p.m. and 12:00 a.m., MTT1 arrived in close proximity to 40 E. Fieldstone Circle, Oak Creek, WI.

53. On July 30, 2010, at 12:29 a.m. (CDT), YIM (STT21) called HOA (MTT1). During the call, HOA told YIM that HOA delivered $296,500 to a courier who was on his way back to Seattle with the money. At 12:40 a.m., case agents arrived in the area of 40 E. Fieldstone Circle and located a silver 2007 Toyota 4-Runner bearing WI plate 257-LEN (registered to HOA at 5728 Evarit Dr., Racine, WI). The vehicle was parked in a visitor parking area just east of 40 E. Fieldstone Circle. At 1:37 a.m. (CDT), case agents observed HOA and another Asian male exit a building at 40 E. Fieldstone Circle, Oak Creek, WI. HOA entered the driver's seat of his silver 2007 Toyota 4-Runner. The other male entered the driver's seat of a black SUV that was also parked in the visitor parking area. The plate on the black SUV was identified by case agents as 240-NBL (registered to VU Q. Nguyen at 4879A S. 27th St., Milwaukee, WI). The male

35

drove the vehicle into an empty garage at 40 E. Fieldstone Circle and closed the door. Case agents then followed HOA back to his residence on Evarit Drive in Racine.

54. On August 4, 2010, at 1:03 p.m. (PDT), YIM (STT21) called HOA (MTT1). HOA said "You know...your guy? He come over there already. He see my people for tomorrow, not today...He just call me. He don't want to see today he want to see tomorrow." *Case agents believe HOA was telling YIM that YIM's marijuana distributor (PHUC) in HOA's area will meet with HOA's associates the following day rather than that day. Agents are aware that HOA was in the Seattle area at the time of this call and believe that when HOA referred to "my people" he was referring to VU.* Cell tower records for MTT7 (PHUC) show that PHUC travelled from Seattle to Chicago between August 1-4, 2010. Toll record show a call from HOA (MTT1) to PHUC (MTT7) on August 4, 2010, at 11:40 a.m. (PDT).

55. On August 5, 2010, phone records show eight contacts between PHUC (MTT7) and (630) 340-9454 (MTT14-VU). Cell tower records for MTT7 revealed that at 4:26 p.m. (CDT) PHUC was in the area of 6182 Mayfair St., Morton's Grove, IL, later identified as the residence of SAM. PHUC then travelled to the area of 5728 Evarit Dr., Racine, WI (HOA's residence) and was there from at least 5:42 p.m. to 5:55 p.m. PHUC then travelled to the area of Nail's Fashion (VU's business) at 4879A S. 27th St., Milwaukee, WI, and was there from at least 6:33 p.m. to 7:08 p.m. (CDT). *Case agents believe the series of calls between PHUC and VU is consistent with PHUC arriving in the Chicago area, making phone contact with VU and then travelling to meet VU to pick up marijuana and/or receive a delivery of marijuana.*

56. On August 10, 2010, at 3:24 p.m. (CDT), HOA (MTT1) called YIM (STT21) and YIM told HOA that couriers wanted to deliver 85 ½ pounds to HOA in Minnesota, not Milwaukee. On August 11, 2010, at 6:17 p.m. (CDT), HOA (MTT1) called YIM (STT21) and

36

indicated that he (HOA) just spoke to the courier and confirmed that HOA had to travel to Minnesota and was leaving shortly. HOA told YIM he was bringing "paperwork" (money), saying "...for us one-eighty ($180,000) and for another guy (PHUC) twenty" ($20,000[12]). Court-authorized positional tracking of MTT1 revealed HOA travelled from Racine, WI, northwest along Interstate 94 toward Minnesota.

57. On August 12, 2010, at 12:34 a.m. (CDT), case agents monitoring a GPS device on HOA's vehicle[13] observed the vehicle had entered Minnesota travelling westbound on Interstate 94. A traffic stop was conducted at about Mile Post 253 by a Minnesota State Trooper. HOA was identified as the driver of the vehicle. When asked where he was heading, HOA responded that he was meeting a friend to go fishing. However, HOA could not provide the trooper with his friend's name or the location of the fishing excursion. When asked if the vehicle contained money or contraband, HOA responded no. The trooper then asked HOA for consent to search the vehicle and HOA agreed. During a search of the front driver and passenger seats with the aid of a K-9, the trooper located 16 heat-sealed bags containing a large amount of U.S. Currency concealed inside of the front seat covers. The currency was later counted and found to total $200,995. The trooper also retrieved two cell phones, one of which was believed to be 262-676-1338 (MTT10), from the vehicle. A search of the two cell phones revealed that each had a stored entry for (773) 733-1986 (MTT3) with "VU" next to each entry, and an entry for (206) 518-7760 (MTT7) with "PHUOC" next to each entry. One of the phones contained entries for (206) 375-7410 (STT21-YIM) with "Brother" next to the entry, 773-677-8888 (AN) with

_____

[12] Case agents are aware that HOA had delivered a quantity of marijuana to PHUC Tran on behalf of YIM and that YIM had directed HOA to collect money for the marijuana.

[13] The GPS device was placed under HOA's Toyota 4-Runner on August 11, 2010, while the vehicle was parked in a public lot.

"Thien" next to the entry, and (773) 801-8855 (JOHN) with "Ut" next to the entry. The second phone contained an entry for (773) 322-3705 (JOHN) with "Ut" next to it. HOA told the trooper he knew the currency was in his vehicle, but stated the money was not his and that he was brining it for someone else. HOA signed a release for the money and was released.

58. On August 12, 2010, at 2:22 p.m., VU's Lexus arrived at 40 E. Fieldstone Circle, Apartment #8. The garage door opened, the Lexus parked inside the garage, and then the garage door closed. At about 3:38 p.m., case agents observed the garage door open and saw VU walk to the back of the Lexus, open the tailgate, and place a cardboard box (approximately 12" X 12" X 8") inside the back of the Lexus. VU then drove to the Sam's Club located at 6705 S. 27th St., Franklin, WI, and parked in the parking lot. Case agents observed an unknown male walk to the driver's side of the Lexus and speak with VU. The male then opened the tailgate to the Lexus and removed the cardboard box while VU remained in the driver's seat. The male placed the cardboard box in a grey BMW with the WI plate 720-MYM, a vehicle later determined to be used by Sourideth JOE Chansomphou, (Registered to Jesus Conteras at 1611 S. 30th St., Milwaukee, WI) that was parked nearby and walked into the Sam's Club. The Lexus then went to Nail's Fashion Salon at 4879A S. 27th St. and VU was observed exiting the Lexus and entering the salon. *Case agents believe VU obtained a box containing a quantity of marijuana from his residence at 40 E. Fieldstone Cr. and delivered it to the male who drove it to the Sam's Club. The male driver of the BMW, believed to be JOE based on later investigation, retrieved the marijuana from VU's car and placed it in his own vehicle.*

59. On September 9, 2010, at 3:12 p.m. (CDT), a black 2005 Nissan Murano, bearing WI license plate 692-REA (Registered to MH at XXXX McKinley Rd., Hartford, WI), parked in front of Nail's Fashion, 4879A S. 27th St., Greenfield, WI. An Asian male exited the driver's seat

38

and entered Nail's Fashion. Agents later viewed a photo of Sourideth JOE CHANSOMPHOU (JOE) and identified him as the driver of the Nissan. A few minutes later, VU, JOE, and TIEN Nguyen exited Nail's Fashion and stood in front of the business talking and smoking cigarettes. At 3:21 p.m. (CDT), JOE opened the rear passenger-side door of the vehicle and retrieved a white, plastic grocery bag. The bag appeared to be ¾ full and knotted at the top. JOE handed the bag to VU who carried the bag inside and toward the back of the business. JOE followed VU inside and was observed talking to VU inside the business. At 3:43 p.m. (CDT), JOE exited Nail's Fashion and entered the driver's seat of the Nissan and left the area.

60.    On September 9, 2010, at 2:38 p.m., (CDT), surveillance observed HOA arrive at VU's residence driving a black Toyota Camry, bearing license plate 513-RSA (Registered to Tuyet NGUYEN (HOA's wife) at 5728 Evarit Dr., Racine, WI.) HOA was accompanied by an unknown Asian male (MUM4). At about 2:40 p.m. (CDT), agents observed HOA stand about 20 feet to the east of the garage at VU's residence and talk on a cell phone. A check of the pen register on MTT6 (HOA) revealed a phone call was being received from CTT2 (DUC). HOA then entered the garage with VU and MUM4 and the garage door closed behind them. At about 3:05 p.m., the garage door opened and the three subjects exited the garage. HOA entered the front passenger seat of the black Toyota, MUM4 entered the driver's side of the black Toyota, and VU entered the driver's side of another vehicle. Agents followed the black Toyota to the Petco store parking lot located at 5222 W. Touhy Ave. in Skokie, IL. The Toyota arrived at approximately 4:34 p.m. and parked in the lot. At about 4:36 p.m., agents observed a brown 2000 Jeep Grand Cherokee with IL license plate J956589 (registered to ML and AL at XXXX Mayfair St, Morton's Grove, IL) park next to the Toyota Camry. A subject later identified as SAM Huynh (SAM) exited the Jeep and walked to the rear of the Toyota Camry where he was

39

met by HOA and MUM4. SAM removed a white box, approximately 36" X 24" X 12," from the back of the Toyota Camry and placed it in the back of the Jeep. The three subjects stood at the back of the vehicles and talked for approximately ten minutes. HOA then entered the passenger side of the Toyota Camry and MUM4 entered the driver's side. SAM entered the driver's side of Jeep. The Toyota Camry drove eastbound on W. Touhy Ave. Agents followed the Jeep to XXXX Mayfair St., where the vehicle parked on the north side of the building. *Case agents believe HOA picked up an amount of marijuana from VU's residence, 4o E. Fieldstone Cr.. #8, Oak Creek, WI and delivered it SAM in Illinois.*

61. On September 30, 2010, at 3:00 p.m., case agents conducted surveillance at VU's residence, 40 E. Fieldstone Cir, Apt #8 in Oak Creek, WI. At about 3:28 p.m., the garage door opened. VU and HOA were observed standing at the rear of VU's Lexus SUV, bearing WI license plate 240-NBL. VU entered the driver's side and HOA entered the passenger side of the SUV. Agents followed the SUV to the 1300 block of W. Rawson Ave., but lost sight of the vehicle. The pen register for MTT5 (VU) showed an outgoing call from MTT5 to (920) 217-1392 at 4:02 p.m. followed by a call from (920) 217-1392 to MTT5 at 4:05 p.m. At about 4:15 p.m., agents observed the Lexus arrive at the Nail's Fashion nail salon located at 4879A S. 27th St., Milwaukee, WI. HOA and VU entered the nail salon. At 4:17 p.m., a black Nissan Murano with WI license plate 692-REA drove into the parking lot. Agents observed JOE exit the vehicle and enter the nail salon.

62. At 4:25 p.m., VU, HOA, and JOE exited the nail salon and sat on the curb outside of the nail salon. At 5:02 p.m., JOE entered the Nissan Murano and drove across the street to the Citgo gas station located at 4866 S. 27th St. The Nissan parked at a gas pump on the south side of the parking lot where JOE pumped gas into the Nissan. The pen register for MTT5 revealed a

40

call from (920) 217-1392 to MTT5 (VU) at 5:04 p.m. At about that same time, VU drove his Lexus across the street to the Citgo gas station and parked behind the Nissan next to a gas pump. VU then opened the rear hatchback to his Lexus, removed a bucket and placed it on the ground. JOE then walked to VU's Lexus, reached into the rear cargo area, removed a brown box measuring about 12" X 12" X 8," carried the box to the Nissan and placed it in the rear cargo area. Agents then followed JOE to 1033 N. Old World Third St., where he drove into a garage beneath the building.

63. On October 29, 2010, at 3:09 p.m., agents observed HOA arrive at Nail's Fashion driving the black Toyota Camry, bearing Wisconsin license plate 513-RSA (Registered to Tuyet Nguyen). HOA exited the driver's seat and two other unidentified males exited the vehicle. The three subjects stood in front of the vehicle talking. VU then exited Nail's Fashion and joined the other three. All four subjects stood outside for several minutes before entering Nail's Fashion. At 3:27 p.m., HOA and VU exited Nail's Fashion. HOA opened the trunk of the black Camry. Case agents saw HOA open a brown cardboard box which was in the trunk. The box was sealed with blue tape. HOA and VU looked into the box and appeared to be manipulating objects inside of the box. VU then removed some newspaper from inside the box, reached back into the box and removed an object about the size of a brick. VU wrapped this object in the newspaper and concealed it close to his body. HOA closed the trunk and he and VU re-entered Nail's Fashion. The size of the box is consistent with boxes VU has delivered to other subjects during suspected marijuana transactions. *Agents believe VU removed a quantity of marijuana from the box in HOA's trunk and took it into Nail's Fashion.*

64. On November 7, 2010 at 7:23 p.m., 7:49 p.m., and 8:51 p.m., YIM (MTT16) called HOA (MTT13). During these calls, YIM and HOA discussed in detail the money owed

Case 2:11-mj-00848-NJ    Filed 07/01/11    Page 42 of 76    Document 1

for prior marijuana deliveries and how much profit YIM, HOA, and DUC stood to make from the prior deliveries. YIM told HOA, "$435,400…that's the total of, uh, what, what we sell it for." YIM continued to tell HOA different costs: "and then minus, uh, $359,225 (cost of the marijuana)…minus $24,587…that's for the UPS (courier)...minus three dollars ($3,000) for the UPS for the paperwork (transporting money)…then the total come out to be $48,587.50…is what we made after everything…divided by 3, between us three, it's $16,195.33." HOA and YIM also discussed the money PHUC owed to DUC for prior marijuana deliveries. HOA also told YIM he asked PHUC to take HOA's money to DUC (in Canada), but PHUC said he was going to fly out to see DUC and take his own money and wouldn't take HOA's money. HOA told YIM when the courier delivered marijuana to HOA, HOA would send the money back with the courier. HOA asked YIM to send him different strains of marijuana. YIM said he would figure things out with the courier and would let HOA know.

65. On November 8, 2010, at 1:25 p.m., HOA (MTT13) called VU (MTT19). HOA asked VU how much money they had outstanding. VU told HOA, "Perhaps 90 ($90,000) something or one dollar." HOA asked VU, "Including this 16 ($16,000) here too?" VU replied, "Including the 15, then yeah included, so it's probably around a dollar twenty ($120,000)." VU told HOA he was collecting money. HOA told VU he talked to YIM yesterday and they would be sending the courier to pick up the money. *Case agents believe HOA was checking how much money they were owed for past marijuana deliveries. VU told HOA about $90,000. HOA asked if that included $16,000 he had. VU said including that money it would be about $120,000. Case agents believe HOA had the $16,000 at his residence.*

66. On November 9, 2010, at 5:55 p.m., PHUC (773-754-6198) called HOA (MTT12) and asked HOA if it was also "hard" (slow business) up by VU. HOA said it was.

42

Case 2:11-mj-00848-NJ    Filed 07/01/11    Page 43 of 76    Document 1

PHUC told HOA he had about 10 something "Grand Daddy" (10 pounds of a marijuana strain known as Grand Daddy) and told HOA to ask VU if he wanted to help PHUC out. HOA told PHUC he would ask. HOA asked PHUC for the "number" (the price). PHUC told HOA he had "about 10...about 15 something" (10 to 15 pounds). HOA asked for the price again, but PHUC stated he did not know the number yet, but between them, the number should be "soft" (flexible) just to clean it up (meaning to get rid of it). HOA told PHUC he would get back to him.

67. On November 10, 2010, at 9:49 a.m. PHUC (MTT7) called HOA (MTT12). HOA asked PHUC for the "number" (price of marijuana). PHUC told HOA, "They give me only 32 ($3,200 per pound)." PHUC said the marijuana was not the best quality, but the price had to match the quality. They discussed selling for a lower, fair price. HOA said his customers wanted to see a "photo" (sample). PHUC said he would get a sample and told HOA "ask VU if it okay then we do it. We are working together." HOA replied "He wants to see the photo (sample) and number (price)."

68. On November 12, 2010, at 5:02 p.m., PHUC (MTT7) called HOA (MTT12) and told HOA he was coming to see him. HOA asked if PHUC was bringing the "photo" (marijuana sample) and PHUC said yes. HOA then confirmed he was at the store (Lee Nail Salon in the Regency Mall in Racine, WI). At 6:45 p.m., case agents observed a gold 2005 Chrysler minivan bearing Illinois license plates L501236 (Registered to HIEN TRAN) park near HOA's silver Toyota 4-Runner in front of the Regency Mall in Racine. PHUC exited the minivan and an unknown Asian female exited the front passenger's seat. Both PHUC and the female walked into Regency Mall. At 7:08 p.m., surveillance observed HOA and PHUC exit the service entrance of Lee Nail Salon and walk directly to PHUC's gold minivan, where PHUC opened the driver's door. PHUC reached inside the van in the area of the driver's seat, retrieved an object,

43

and handed something to HOA. HOA reached into the small of his back and tucked the object into the back of his waistband. HOA and PHUC walked toward HOA's 4-Runner where HOA opened the front passenger's door of this vehicle. HOA reached back into the small of his back and placed something in the area of the front passenger's seat of this vehicle. HOA closed the door of this vehicle. He and PHUC then walked back into Lee Nail Salon. At 7:20 p.m., HOA (MTT13) called VU (MTT19) and told VU he had the sample of marijuana for him (from PHUC earlier in the evening). VU told HOA he would come see him in a while and would bring HOA money too.

69.     At 8:50 p.m., VU (MTT18) called HOA (MTT13) and told him he was at HOA's house. HOA said he would be there shortly. *As they talked about in previous calls, case agents believe VU met with HOA to pick up the sample of marijuana and to drop off money.* At 11:50 p.m., HOA (MTT13) called VU (MTT19) and told him he forgot the sample of marijuana and that HOA would get it to him the next day.

70.     On November 15, 2010, at 1:03 p.m., SAM (MTT8) called HOA (MTT12). HOA asked SAM if he wanted some "Mango" (strain of marijuana) that HOA had. SAM said no because he was waiting for his own supply which was coming that week. SAM agreed to give HOA a sample of the marijuana when it was available. HOA and SAM discussed several different strains of marijuana and their ability to sell each. HOA told SAM he would see what his customers thought of SAM's sample and then decide what to do. At 7:48 p.m., HOA (MTT12) called SAM (MTT8) and asked if he could see him the next day. SAM said he didn't have his own marijuana yet, but his friend did. SAM agreed to meet HOA the following day.

71.     On November 16, 2010, at 2:46 p.m., HOA (MTT12) called SAM (MTT8) and told him he would see him at about 4:00 p.m. At 4:01 p.m., SAM (MTT8) called HOA

44

(MTT12). HOA and SAM agreed to meet at the Petco store[15] in 15 minutes. At 4:16 p.m., surveillance agents observed HOA meet with SAM in the Petco parking lot and identified SAM based on their viewing of his Illinois driver's license photo. HOA appeared to receive an object from SAM, who then drove directly to his residence at 6182 Mayfair St., Morton's Grove, IL. At 4:24 p.m., HOA left the Petco parking lot in his Toyota Camry. At 4:25 p.m., HOA (MTT12) called JOHN (MTT24) and asked where he was. JOHN said he was at home. HOA said he would be there in 15 minutes. Surveillance units followed HOA directly to 2449 W. Fargo Av., Chicago, IL, the residence of JOHN and THANH LAI and a building owned by AN. HOA parked and entered the residence at 4:43 p.m. carrying a white bag which contained a box about the size of a shirt box. At 4:53 p.m., HOA exited the residence. *Case agents believe HOA took JOHN the sample of marijuana he received from SAM.* At 5:04 pm., HOA (MTT12) called SAM (MTT8). HOA told SAM his customer (JOHN) wasn't interested in the sample and only wanted it at $3,100 per pound. HOA and SAM agreed the price was too low.

72. At 5:11 p.m., PHUC (MTT7) called HOA (MTT12). HOA told PHUC "This one he said 29 ($2,900 per pound of marijuana)." *Case agents believe HOA took the sample of marijuana he had previously obtained from PHUC to show to JOHN along with the sample from SAM.* PHUC asked if the customer had the money right away, but HOA said it would be a couple weeks. HOA said he had done business with the customer already and he is trustworthy. PHUC said he would check with his "uncle" [older partner or relative] to see if that was ok.

73. At 5:15 p.m., JOHN (MTT24) called HOA and told him to "get them all." At 5:23 p.m., PHUC (MTT7) called HOA (MTT12) and asked HOA if the customer would be able

---

[15]On September 20, 2010, case agents observed SAM and HOA meet at the Petco store located at 5222 Touhy Ave., Skokie, IL.

Case 2:11-mj-00848-NJ    Filed 07/01/11    Page 46 of 76    Document 1

to pay for some of the marijuana up front if PHUC reduced the price by "50 cents or one" ($500 or $1000 per pound). PHUC said his "uncle" wanted PHUC to get $10,000 up front. HOA agreed to pay the $10,000 up front as partial payment for the marijuana. At 6:31 p.m., HOA (MTT12) called JOHN and told JOHN he (HOA) was trying to get a hold of PHUC to pick up the marijuana that night. If PHUC couldn't get it that night, it would be the next day. HOA and JOHN agreed the price would be $3,300 per pound. At 6:32 p.m., PHUC (MTT7) called HOA (MTT12). HOA asked if he could pick up the marijuana that night, but PHUC told him it would have to be the next day because it hadn't been dropped off to him yet. PHUC told HOA he was going to Seattle the next day, but he would arrange for someone to deliver the marijuana to HOA. PHUC also told HOA he was taking a "bundle" (money) to "Auntie" (DUC). At 6:56 p.m., HOA (MTT12) called JOHN (MTT24). JOHN told HOA he could sell the $3300 strain of marijuana he got from HOA for $3400-3500 per pound, but couldn't sell the $3600 per pound marijuana. HOA told JOHN he would bring the marijuana the next day. Case agents believe JOHN told HOA he could sell the marijuana HOA got from PHUC ($3300), but couldn't sell the marijuana he got from SAM ($3600).

74. On November 17, 2010, at 5:21 p.m., HOA (MTT12) called PHUC (MTT7). PHUC told HOA he was in Seattle and told HOA the marijuana had not yet arrived at PHUC's house in Chicago, but PHUC would call HOA when it got there. At 7:58 p.m., PHUC (MTT7) called HOA (MTT12) and told him the marijuana had arrived at PHUC's house. PHUC said he would have his wife or his "old man" deliver it to HOA at a Walgreen's near Touhy Ave. and Western Ave. in Chicago. *Case agents observed at least nine outgoing calls from HOA (MTT12) to JOHN (MTT24) that appeared to go unanswered. Case agents believe HOA was attempting to contact JOHN to arrange the delivery of marijuana, but was unable to get a hold of him. At*

46

11:15 p.m., JOHN (MTT24) called HOA (MTT12) and told him he couldn't find his phone all day. They agreed that HOA would meet JOHN at about Noon the next day. Agents believe this was to deliver the marijuana to JOHN.

75. On November 18, 2010, at 10:48 a.m., HOA (MTT12) called PHUC (MTT37). PHUC told HOA he would arrange for his wife to meet HOA at Touhy and Western in Chicago to deliver the marijuana to HOA. HOA also told PHUC "I'll bring 10 also, alright?" Case agents believe HOA told PHUC he would give his wife $10,000 as partial payment for the marijuana. At about 10:49 a.m., surveillance observed HOA exit his residence in Racine, WI, enter the driver's seat of his silver Toyota 4-Runners, and drive to Chicago. Between 12:10 and 12:25 p.m., there were several calls between HOA (MTT12) and PHUC's wife, HIEN Tran. They were having trouble finding each other, but eventually agreed to meet at an Auto Zone store at 2530 W. Touhy Ave., Chicago. At 12:40 p.m., surveillance observed HOA arrive at the Auto Zone. At 12:55 p.m., surveillance observed a blue Honda Pilot, bearing Washington license plate 881-ZXF (Registered to HIEN Tran), arrive at the Auto Zone.[16] HOA entered the Honda and briefly spoke to the Asian female driver, who surveillance later identified as HIEN. He then re-entered his 4-Runner and both vehicles drove to a nearby Walgreens store. HIEN and a small child exited the Honda and walked away. HOA entered the Honda and drove directly to 2449 W. Fargo Ave., the residence of JOHN and LAI. Surveillance units observed HOA go toward the rear of the residence, but because of other vehicle traffic, their view was obstructed and they were unable to see if HOA was carrying anything.

---

[16] On September 3, 2010, court-authorized monitoring of YIM's telephone indicating PHUC was to meet YIM to receive marijuana, Seattle case agents observed YIM and PHUC meet at a Costco Store in Renton, WA. YIM carried a large plastic garbage bag to PHUC's vehicle, the same blue Honda HIEN Tran drove to meet HOA in Chicago on November 18, 2010.

47

76. At 12:59 p.m., JOHN (MTT24) called HOA (MTT12) and told him to come inside so they could "count it" (weigh the marijuana). At 1:07 p.m., HOA (MTT12) called PHUC (MTT7). HOA said the marijuana did not appear to be the same marijuana as the sample and it wasn't as good. PHUC told HOA the marijuana came from the house HOA was at the other day (10409 Evendale Rd., Huntley, IL). PHUC told HOA to try to sell the marijuana anyway. At 1:11 p.m., HOA (**MTT12**) called PHUC (MTT7) and told him his customer (JOHN) "wants to reduce two dollars ($200). I didn't accept. I gave him a dollar ($100) off, but he didn't accept." *Agents believe JOHN wanted the price reduced by $200 dollars, but HOA only wanted to reduce it $100.* PHUC told HOA he could sell it for any price as long as HOA could make his share. About 15 minutes later, HOA returned to the Honda and drove back to the Walgreens lot. He retrieved an object from the back seat of his 4-Runner and carried it to the Honda. HOA was observed putting the object under the driver's seat of the Honda. *Case agents believe this was the $10,000 HOA had agreed to provide as partial payment for the marijuana.* HIEN and the child then returned to the Honda. HOA entered his 4-Runner and drove back to Wisconsin. Surveillance followed HIEN who drove back to 987 Mayfair Ct., Elk Grove Village, IL.

77. On December 15, 2010, at 2:34 p.m., (604) 782-0184 (DUC) called HOA (MTT12). DUC said she was sending a courier to meet him and pick up "the letter" (money) from HOA and confirmed that HOA had "two dollars" ($200,000). HOA told her the courier could call the same number, MTT12. At 2:59 p.m., an unidentified female using (763) 656-8971 called HOA (MTT12) and confirmed she was the courier sent by DUC. The female told HOA she could meet him early the next morning or she could send her "brother" to meet HOA that night. HOA said either one was okay. The female said she would call back in an hour.

78. At 3:01 p.m., VU (MTT18) called AN (MTT21) and asked if he could drive down to see AN (to pick up the money[14]). AN said yes. At 3:02 p.m., VU (MTT18) called Nail's Fashion and asked his fiancée, Tu LY, if he could go to Chicago to pick up money. She told him to handle nail business then he could go. During the late afternoon, surveillance units had followed VU from Nail's Fashion to his residence at 40 E. Fieldstone Cr., Oak Creek, WI, and then to Chicago, IL. At 3:22 p.m., HOA (MTT13) called VU (MTT18) and the two discussed collecting money to give to the courier who was expected to arrive in the Milwaukee area.

79. Shortly after the above call with HOA, VU used MTT19 to place outgoing calls to MTT32 (JOE) at 3:50 p.m. and MTT31 (JOE) at 3:52 p.m. At 3:53 p.m., VU (MTT18) called (414) 736-4226, a phone subscribed to Tu LY, whom case agents believe is VU's fiancée. LY works at Nail's Fashion with VU. VU told LY, "Later, JOE will bring the money over. Put it away, ok?" LY asked, "Which guy?" VU repeated, "JOE." VU told her JOE would be there in ten or fifteen minutes. [Case agents believe the outgoing calls to MTT31 (JOE) and MTT32 (JOE) were calls to JOE during which JOE agreed to deliver money to Nail's Fashion.] At 3:54 p.m., VU (MTT19) called HOA (MTT13) and told him "Tonight there'll be a little of something." HOA replied, "I drive up, ok?" *Case agents believe VU told HOA he would have money available for him that night after JOE dropped it off.* At 4:21 p.m., VU (MTT18) called (414) 282-4830, the business phone for Nail's Fashion, and spoke to Tu LY. VU asked her, "How much did he gave you?" LY replied that she hadn't counted the money because there were customers in the store. At 5:12 p.m., VU (MTT18) called the business phone for Nail's Fashion again. TU answered and VU told her "Take the papers (money) and put it in the microwave."

[14] Case agents had previously intercepted a text message believed to be from AN (MTT28) to VU (MTT18) on December 15, 2010, at 1:14 p.m. The message read "NFL +55007, NBA +1913 and 13002 −1200, total +55720."

49

VU then told her to close the store at 7:30 p.m. if there were no customers. *Agents believe VU told TU to take the money JOE had given her and place it in the microwave at the store.*

80.     At 5:04 p.m., the female using (763) 656-8971 called HOA (MTT12) and said she was sending her "brother" to meet HOA and he would be there in about 8 hours. The female asked HOA to text her HOA's address which HOA agreed to do. The female said she would give HOA's address and phone number to her "brother," who would contact HOA directly.

81.     At about 6:40 p.m., VU was observed meeting with AN near AN's business, Lee Nail Supply at 1102 W. Argyle St. in Chicago. AN and VU then went to the Tien Giang Restaurant which is believed to be owned by AN and his wife, Jennifer. After about one hour and fifteen minutes, AN and VU drove to another location in Chicago. Forty minutes later, AN and VU drove to 2449 W. Fargo Av. and they both entered the building. About 20 minutes later, AN and VU left the building and drove to AN's residence, 4933 Coyle Ave., Skokie, IL. AN entered the residence and VU began driving back toward Milwaukee. At 11:00 p.m., VU (MTT19) called HOA (MTT13) and arranged to meet HOA in Racine, WI. Surveillance units then observed HOA and VU meet in an alley in Racine, WI. After about two minutes, HOA and VU left the area. VU drove back toward Milwaukee and HOA drove back to his residence at 5728 Evarit Dr., Racine, WI. *Based on the above calls and events, case agents believe VU initially met with AN in Chicago to pick up the gambling money VU had won during the previous week. VU then met with HOA in Racine and gave the money to HOA to give to the DTO courier sent by DUC. Case agents further believe this demonstrates how HOA, VU, and other members of the Wisconsin DTO and SWO co-mingle drug and gambling proceeds to pay debts owed to DTO suppliers or members of the Wisconsin SWO and AN's SWO who have won money.*

50

82. From approximately 2:20 a.m. to 2:35 a.m., a person later identified as Quan HOAC (612-812-2545) called HOA (MTT12) several times and the two arranged a meet location. Eventually HOA and HOAC met at a Wal-Mart at 3049 S. Oakes Rd., Racine, WI. HOAC was driving a black 2007 BMW, bearing Minnesota license plates XXE639. HOAC followed HOA back to HOA's residence at 5728 Evarit Dr., Racine, WI. At 2:39 a.m., HOA (MTT12) called DUC and told her the courier (HOAC) had arrived. HOA asked DUC if he should give "it" (money) to him (HOAC) and DUC said yes. At about 2:45 a.m., surveillance units observed HOAC drive away from HOA's residence. Case agents followed HOAC west on I-94 for about two hours. A Wisconsin State Patrol trooper then conducted a traffic stop of HOAC's vehicle for having an illegible license plate. HOAC was identified by a Minnesota driver's license. A K-9 deployed on the outside of HOAC's vehicle alerted to the presence of controlled substances inside the interior and trunk of the vehicle. During a search of the vehicle, the trooper located two shopping bags, which contained several vacuum-sealed packages of U.S. Currency. HOAC stated a friend of his offered to pay him $3,000 to pick up the money from someone in Wisconsin and hold it for him. HOAC identified his friend as Tong NGUYEN and provided a partial phone number of (612) 338-71??. *Case agents do not believe HOAC was being truthful with the trooper and did not fully cooperate with the Trooper while at the scene.* During a search of HOAC's cell phone, the trooper observed HOA's phone number (MTT12) in the recent call list. The trooper seized the U.S. Currency. HOAC was cited for operating with a suspended driver's license and released. The currency was later counted and found to be $199,940. *Case agents believe the $199,940 represented the "two dollars" ($200,000) HOA agreed to give the courier to be delivered to DUC. Agents believe the money was payment for past deliveries of marijuana supplied to HOA by DUC.*

51

83. On December 17, 2010, during a series of calls between HUY (MTT26) and VU (MTT18), HUY told VU he was driving from Chicago to Milwaukee. At 5:14 p.m., HUY told VU he had almost arrived. At 6:08 p.m., VU (MTT18) called AN (21). VU told AN "About the shirts (marijuana). They are all different sizes (strains of marijuana." AN told VU "I call him and call you right back." *Case agents believe HUY delivered an amount of marijuana from AN to VU. VU complained to AN the marijuana was not the same marijuana he had previously received from AN. AN told VU he would find out and call VU back.* At 6:12 p.m., an unidentified male called VU (MTT18) from (773) 219-8616 (MTT27) a phone used by members of AN's SWO to contact VU. The caller told VU "Different shirt, but it's the same inside…It's guaranteed to be the same. The only difference is the shirt." *Case agents believe the caller told VU the packaging of the marijuana was different, but the marijuana itself was the same as what VU had previously received.* VU told the caller there were five or six different kinds of marijuana. The caller replied "Tell Fatso (HUY) to bring it back." VU replied HUY had left already. VU said he would try to sell the marijuana. Positional tracking of MTT18 revealed VU was in close proximity to Nail's Fashion, 4879A S. 27th St. at the time of this call.

84. On December 22, 2010, at 10:52 a.m., Vinh TRINH[15] (LTT7) called HOA (MTT12) and said he was on his way to meet HOA. *Case agents believe TRINH was going to deliver samples of marijuana to HOA.* At 1:47 p.m., HOA (MTT12) called TRINH (LTT7). HOA gave TRINH directions to a meet location in the Milwaukee area.

85. On December 22, 2010, at 1:58 p.m., AN (MTT21) called VU (MTT18). AN asked VU "Do you want to eat more rice (marijuana)?" VU replied "Those pots of rice. I think

---

[15] Case agents sent a recording of one of the calls, during which HOA was giving TRINH directions, to DEA-LA case agents who are familiar with TRINH's voice. The agents confirmed the voice was that of Vinh V. TRINH.

we'll probably have to exchange for a different pot of rice." AN asked "How many bowls (pounds) you still have left?" VU replied "They don't want to eat those eight cakes." AN agreed to take the marijuana back and told VU "Later at night is fine." At 6:30 p.m., HUY, using MTT27, called VU (MTT18) and told VU "I see you in a little bit." Case agents believe HUY was coming to meet VU to pick up the marijuana on AN's behalf. At 7:25 p.m., VU (MTT18) called MTT27 and HUY answered the phone. VU told HUY not to bring any marijuana with him. HUY said "I have cakes (marijuana) in the car." VU said he didn't want the marijuana. HUY told VU to speak to "Big Brother" and handed the phone to AN. AN asked VU to give AN money to help pay AN's gambling losses for the last week. AN also told VU "When I told you in the morning, you sort of said yes, right?...I already take it halfway." Vu told AN "I still have a few cakes left." AN told VU "If you can, you help me (sell the marijuana). If not able to, I'll come up again next week to get it back." VU agreed to take the marijuana from AN. At 9:24 p.m., HUY (MTT26) called VU (MTT18) and told him he had arrived already. VU told HUY he was coming outside. Positional tracking of MTT18 indicated VU was at his residence at 40 E. Fieldstone Circle, Oak Creek, WI. At 9:26 p.m., VU (MTT18) called HUY (MTT26) and told HUY he was on the way to meet him. VU told HU he would take HUY's car to deliver the marijuana to his customer and HUY agreed. *Case agents believe AN initially asked VU if he wanted more marijuana and VU said no and that he hadn't sold all the marijuana he had. AN said he would pick up the marijuana. Later that night, HUY called and said he was bringing marijuana to VU. VU said he didn't want the marijuana and HUY handed the phone to AN. AN and VU agreed there was a misunderstanding, but VU agreed to take the marijuana from AN. VU then met with HUY and AN and took HUY's car to drop off the marijuana.*

53

Case 2:11-mj-00848-NJ    Filed 07/01/11    Page 54 of 76    Document 1

86. At 2:39 p.m., HOA (MTT12) called TRINH (LTT7) and arranged to meet at a nearby restaurant. Surveillance units tried to locate HOA and TRINH in the area, but were unable to find them.

87. At 3:36 p.m., HOA (MTT13) called VU (MTT18) and told VU, "I have some pictures...Pictures that he (TRINH) just delivered. Just done meeting with him. The guy from the other day." HOA then told VU he was close to VU's store. At 3:44 p.m., HOA (MTT13) called VU (MTT18) and told him "I can't get it out right now...There's a whole bunch like this." HOA then told VU he would drive up to meet him later that night. At 5:26 p.m., HOA (MTT13) called VU (MTT18) and told VU to come see him later. HOA told VU, "It's really good, man!" VU replied, "Let's see what's going to happen." *Case agents believe HOA wanted to show VU the samples of marijuana he had just received from TRINH, but there were too many of them in the car to safely show to VU.* HOA later asked VU to come to his store later that night to see the samples and told VU the marijuana looked to be very good quality. *Case agents believe HOA wanted to show VU the samples of marijuana he had just received from TRINH, but there were too many of them in the car to safely show to VU.*

88. On December 23, 2010, at 10:32 a.m., VU (MTT18) called HOA (MTT13). HOA told VU, "I'll come up and bring the sample." VU reminded HOA to seal the bag "so the odor doesn't emit." HOA said he would do that. At 1:28 p.m., VU (MTT19) called HOA (MTT13). They discussed the prices of the different strains of marijuana. HOA told VU the "Blue Dream" was "42 ($4,200 per pound). Same as the other one. Same as Purple Kush." VU then asked "and the Old Man (Grand Daddy)?" HOA said "Old Man is 40 ($4,000 per pound)".

89. On January 2, 2011, at 5:47 p.m., YIM (MTT16) called HOA (MTT13). YIM told HOA, "I send them (courier) out tomorrow." YIM told HOA he was going to give the

54

courier a new "line" (phone) and would also give the courier HOA's number (MTT13). HOA told YIM "Yeah, ok. You can him this line." YIM also told HOA he would shop for different kinds of marijuana to send to HOA if everything went well. YIM told HOA he was going to send HOA "five of one kind and five of another kind." Case agents are aware that YIM and HOA have previously referred to a "table" as a quantity of marijuana representing 10 pounds. Case agents believe YIM was sending HOA five tables of one kind of marijuana and five of another, thus 100 pounds. HOA and YIM also discussed marijuana that was available from another marijuana supplier, believed to be PHUC. YIM told HOA the price for the "kush" (strain of marijuana) was $1,700 per pound. HOA told YIM "I don't think that's the "master kush". Because he told me that, but I don't believe that...If the master kush, how come they have that price?" Case agents believe HOA was questioning whether the marijuana was really "master kush" because the price being asked was too low for that particular strain.

90.     On January 4, 2011, at 8:30 p.m., (206) 407-5980 (the number YIM provided as the courier's number) called HOA (MTT13). The courier told HOA he would be in the area in about nine hours. On January 5, 2011, (206) 407-5980 called HOA (MTT13). HOA and the courier arranged to meet at a Wal-Mart in Racine, WI. At about 9:30 a.m., surveillance units observed HOA and the courier meet at the Wal-Mart. The courier was identified as Michael S. HARMON, a Washington resident. HARMON was driving a white 1998 Dodge pickup, bearing Washington license plate A86887Z (registered to HARMON). HARMON followed HOA to HOA's residence and backed his vehicle up to HOA's garage. HARMON and HOA were observed unloading objects into HOA's garage from the back of the truck.

91.     A short time later, HOA entered HARMON's truck and they both drove to HOA's business, Lee Nail Salon. At 10:51 a.m., HOA (MTT13) called YIM (MTT16) and told him he

55

had met with HARMON. HOA told YIM, "I give him thirty dollars ($30,000)" and told YIM he had to collect more money before he could give YIM more. A short time later, HARMON and HOA left HOA's nail salon. HARMON entered his Dodge truck and left the area.

92. A short time later, HOA drove to a nearby Home Depot where he purchased several cardboard boxes. HOA then drove back to his residence. About 35 minutes later, surveillance observed VU arrive at HOA's residence. VU backed his vehicle into HOA's garage. About one hour later, VU drove to his residence and closed the door. *Based on prior surveillance of HOA and VU, case agents believe the Wisconsin DTO uses VU's residence as a "stash" location. Agents believe VU picked up some or all of the marijuana from HOA's residence and transported it back to his house.*

93. On January 26, 2011, at 1:34 p.m., VU (MTT18) called AN (MTT21). VU asked AN "Do you still have food dishes?" (Members of the Wisconsin DTO have repeatedly referred to quantities of marijuana as "food.") AN replied "Might not have the other thing (money), but food, my house has a lot." VU told AN "I'll take ten then...Then will finish everything in 2, 3 days later." VU asked AN if he could deliver the marijuana to Milwaukee and AN said he would make a call right away. At 2:24 p.m., AN (MTT21) called VU (MTT18). AN asked VU "Do you want to order $20 or 25 or 30." VU told AN he only wanted 10. AN asked "Order 20, all right." VU told AN "Then you should give me a little more time, all right"? AN agreed. *Case agents believe AN wanted VU to order a larger quantity of marijuana that the 10 pounds VU had originally ordered. VU then agreed to take 20 pounds.*

94. On January 27, 2011, at 11:12 a.m., HUY (MTT26) called VU (MTT18). HUY told VU he was leaving Chicago and would be there in about an hour. *Case agents believe HUY was going to deliver the marijuana VU had ordered the day before.* At 12:41 p.m., HUY

56

(MTT26) called VU (MTT18) and got directions to VU's residence, 40 E. Fieldstone Cr., Oak Creek, WI. *Based on the conversation, agents believe VU was standing outside of his residence and observed HUY drive past.* Vu then directed HUY back to his residence.

95. On March 8, 2011, at 12:43 p.m., VU (MTT33) called JOE (MTT36). VU asked "Get the paper (money)?" and JOE replied "Yeah." VU told JOE "I take that and give that to the guy." VU told JOE he would come to his house to pick up the money. *Case agents believe VU was collecting money from JOE for past marijuana deliveries.* Cell towers active for MTT33 at the time of this call indicated that VU was in the area of JOE's residence at 1033 N. Old World Third St. At 12:54 p.m., VU (MTT33) called JOE (MTT36) and told JOE to "open the door". *Case agents are aware there is a small underground parking lot beneath JOE's apartment building.* Agents drove down the alley behind the garage just after this call and observed brake lights, believed to be from VU's vehicle in the garage. *Case agents believe VU drove to JOE's residence and asked JOE to open the garage door. VU then drove into JOE's garage.* At 12:58 p.m., VU (MTT18) called HOA (MTT34) and asked if he could meet HOA at HOA's house in a bit. VU told HOA "I'll bring some papers (money) and also the books (gambling ledgers)." HOA replied "When you start going, call me and I will run home." *Case agents believe VU picked up money from JOE for past marijuana deliveries and delivered it to HOA. VU also told HOA he would bring the gambling ledgers to HOA so they could reconcile their betting records.*

96. On March 10, 2011, at 7:54 p.m., HOA (MTT34) called YIM (MTT16). YIM asked how HOA's marijuana sales were going. HOA said, "They just give me around 80 dollars ($80,000) already...It's in hand right now." *Case agents believe HOA said he had collected $80,000 for marijuana he had sold and that marijuana had come from YIM.* YIM told HOA he wasn't worried about the money at the moment. YIM said, "Do you remember the UPS (courier)

57

that comes see you…Like two months ago, I think, I give them food (marijuana)?" HOA told YIM he remembered the courier. YIM told HOA "They do all of them (sold all of the marijuana they received), but they stuck with 15 (pounds) of the ones, and they say and no good. It's ugly…So basically, would you be able to take that? He brings to you." *Case agents believe YIM asked if HOA would take 15 pounds of marijuana the courier was unable to sell.* HOA told YIM he would check with his customers to see if they would take the marijuana. YIM told HOA the courier wanted to bring the marijuana to him the next day. HOA replied, "Oh, okay. No choice." YIM told HOA the marijuana might be old. HOA replied, "That okay. You know why? Because for last time we gave them the ugly food (marijuana)…They so confused. They don't like it…But for your food. Same as my food. I don't worry about that." YIM told HOA "You don't have to worry about the ticket price…If they say 15 ($1,500 per pound), it's 15. Just whatever, whatever price." HOA agreed to take the marijuana. YIM asked what phone number he could give to the courier. HOA told YIM he could give the courier this number (MTT34). *Case agents believe YIM asked HOA to help sell some marijuana the courier had been unable to sell. YIM didn't believe the marijuana was very good quality and asked HOA to sell it for whatever price he could.*

97. On March 10, 2011, at 8:06 p.m., an unknown male (MUM625)(206-412-1405) called HOA. MUM625 told HOA "Will come tomorrow evening, alright…Tomorrow around six, seven o'clock in the evening." *Case agents believe MUM625 was the courier who was going to deliver the marijuana for YIM.* HOA told MUM625 that time would be fine. The male asked which freeway exit he should take. HOA told MUM625 "335". Exit 335 on I-94 would be consistent with the courier exiting to drive to HOA's residence.

58

98. On March 11, 2011, at 3:56 p.m., MUM625 (206-412-1405) called HOA (MTT34). MUM625 told HOA he would not arrive until about 11:00 p.m. that evening. HOA agreed. At 11:37 p.m., MUM625 (206-412-1405) called HOA (MTT34). HOA gave MUM625 directions to his house. On March 12, 2011, at 12:01 a.m., MUM625 called back and asked which house it was. HOA directed MUM625 to drive down the street and drive into his garage. Surveillance units observed a silver Honda Ridgeline, bearing Minnesota license plate 320CXW drive down HOA's street and enter his driveway.

99. At 12:36 a.m., HOA (MTT34) called YIM (MTT16) and told him the marijuana was very poor quality. HOA told YIM the marijuana was yellow, wet and did not have an odor. The call was then disconnected. At 12:38 a.m., HOA (MTT34) called YIM (MTT16). YIM said "I think the way they keep it for a long time and the way they store it." YIM said "I think the first time they paid 23 ($2,300 per pound) the exact same one." HOA again complained about the quality and told YIM "I don't see nothing. Like no smell and then wet. And then it turn yellow." YIM was surprised and asked to speak to the courier and HOA handed him the phone. YIM asked MUM625 why the marijuana was so bad and how it had been stored. YIM asked "In the storage, is the weather like really cold or what?" MUM625 replied "Maybe. May be cold in there." MUM625 did not have an excuse for the way the marijuana looked. MUM625 told YIM he was going to drive back to Minnesota and then fly to Seattle. YIM then spoke to HOA again and told him to try to sell the marijuana for $1,000 or $500 per pound and then said "If you can't do it, you can't do a thousand ($1,000), five hundred ($500), then it's fucking garbage". HOA told YIM "I call them take a look. If they don't take it maybe throw away." YIM then told HOA if HOA couldn't get that much, he should just use it for cooking or throw it away. HOA told YIM he would see what price he could get for the marijuana.

59

100.    On April 11, 2011, at 9:47 a.m., TU Ly (414-736-4226) called VU (MTT18). TU asked "Why the car smells marijuana, very strong?" VU replied "Oh, take that bag out for me...Take the bag out. Put it out at the garage for me. Put in the garbage can." TU told VU "It's right beside the white box, alright?" Vu agreed. *Case agents believe TU got into their Lexus SUV at TU and VU's residence and found that the vehicle smelled strongly of marijuana. VU told her to take the bag (of marijuana) out of the car and put it in the garage, which she did.*

101.    On April 18, 2011, at 5:01 p.m., HUY (MTT26) called VU (MTT18). VU asked if "the other guy (AN)" deposited a check VU had given to HUY as payment of a gambling debt. HUY told VU he didn't know if AN deposited the check, but then VU told HUY the check had bounced. HUY told VU "I have the other thing (marijuana). Can I give you around ten of them (ten pounds)?..How much did Big Brother (AN) give you in the past?" VU replied "Do you have the beach (strain of marijuana)?" HUY told VU "I don't know. The other guy gave me some breads. I'm planning to bring it up to you tonight to see if you can eat (sell) them." VU asked HUY for money instead of marijuana, but HUY said he only had the marijuana at the time. VU told HUY "Come up to me tonight, then." HUY said he would come to meet VU and then asked "You help me around thirty ($3,000 per pound), alright?" VU again told HUY to come see him that night. *Agents believe VU asked HUY about a check he had written as payment for a past gambling debt. The check had bounced. HUY said he didn't know if AN had cashed the check yet. HUY then asked VU to sell ten pounds of marijuana he had and to pay $3,000 per pound of marijuana. VU agreed to take the marijuana after HUY delivered it to him that night.*

102.    At 5:09 p.m., VU (MTT18) sent HUY (MTT26) a text message which read "Bo try to get the beach (strain of marijuana)." At 5:10 p.m., HUY (MTT26) responded to VU (MTT18) "K". At 5:11 p.m., HUY (MTT26) called VU (MTT18) and told him "Remember not

60

to let anyone know, alright? These guys are different guys. This one does not belong to Big Brother (AN), so don't tell Big Brother or anyone, alright? The deal this time is only between you and me." Vu agreed. *Case agents believe VU asked HUY to try to find the "beach" strain of marijuana which HUY agreed to do. HUY then called VU and asked him not to tell anyone where VU got the marijuana. Agents believe HUY got the marijuana from a supplier other than AN and did not want AN to know he was dealing with other suppliers. VU agreed to keep that secret.* At 7:54 p.m., HUY (MTT26) called VU (MTT18) and told VU he was on the way up to meet VU. VU told HUY to come to his house and told HUY where to exit the freeway. At 9:19 p.m., HUY (MTT26) called VU (MTT18) and told him he was at Burger King at the Rawson Exit [1250 W. Rawson Ave., Oak Creek, WI]. VU told HUY he would come to meet him. *Case agents believe HUY drove the ten pounds of marijuana from Chicago to Wisconsin and delivered it to VU at the Burger King close to VU's residence.*

103. At 10:12 p.m., VU (MTT18) called TU Ly (414-736-4226). VU told TU "Eat first if you're hungry. I won't be back until fifteen or twenty minutes later...I'm on my way to JOE." *Case agents believe VU met with HUY and received the marijuana. He then began driving toward JOE's residence at 1033 N. Old World Third St., Milwaukee, WI. VU called TU and told her he was driving to JOE's and eat without him. Case agents are aware, based on intercepted calls, that JOE was in California at the time of these calls.* Positional tracking of MTT18 revealed VU was driving just south of downtown toward downtown Milwaukee, the location of VU's residence, at the time of this call.

**D. Indictment Information**

104. On April 21, 2011, Federal Grand Jury in the Western District of Washington returned a true bill indicting Drew YIM, DUC T. Nguyen, and nine others with conspiracy to

61

distribute controlled substances in violation Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 846. This indictment is sealed pending the arrests of the named defendants which are scheduled to take place on May 24, 2011.

105. On May 17, 2011, a Federal Grand Jury in the Eastern District of Wisconsin returned a true bill indicting HOA Nguyen, VU Nguyen, Tu LY, Vinh TRINH, AN Nguyen, JOHN Nguyen, HUY Han, PHUC Tran, Hien TRAN, SAM Huynh, Quan HOAC, Michael HARMON, HOANG Nguyen, Sourideth JOE Chansomphou, TIEN Nguyen, and RENO Nguyen with knowingly and intentionally conspiring with each other, and with persons known and unknown to the grand jury, including DUC T. Nguyen and Drew J. YIM, to posses with the intent to distribute and distribute 1,000 kilograms or more of a mixture and substance containing marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846, and Title 18, United States Code, Section 2 (Count One). The grand jury also indicted HOA Nguyen, VU Nguyen, AN Nguyen, HUY Han, Thanh LAI, HOANG Nguyen, and six others with conducting, financing, managing, supervising, directing and owning all or part of an illegal gambling business involving sports betting, which gambling business was a violation of the laws of the State of Wisconsin, to wit, Wisconsin Statutes § 945.02 (Gambling) and § 945.03 (Commercial gambling), and which involved five or more persons who conducted, financed, managed, supervised, directed and owned all or part of said illegal gambling business, and which remained in substantially continuous operation for a period in excess of thirty days in violation of Title 18, United States Code, Section 1955 (Count Two). This indictment is sealed pending the arrests of the named defendants which are scheduled to take place on May 24, 2011.

## E. Specific Information Regarding the Requested Search Locations

106.    **5728 Evarit Drive, Racine, WI.** This is the location of HOA Nguyen's current residence and is more specifically described as a tan and brown brick, two-story, single-family residence with a brown roof located on the north side of Evarit Dr. east of Elwood Dr. The numbers 5728 appear above the garage door on the south side of the building.

107.    **40 E. Fieldstone Court. #8, Oak Creek, WI.** This is VU Nguyen's current residence and is more specifically described as a unit within an 8-unit townhome building with gray siding, white trim and a gray roof. The number "40" appears on a blue, diamond-shaped sign in front of the building. Unit #8 is the furthest east unit and is a three-story unit with a garage on the first floor. The number "8" appears on a door on the east side of the building.

108.    **5758 Durand Avenue, Racine, WI.** This is the location of Lee Nails salon, a business owned and operated by HOA Nguyen and is more specifically described as a storefront with glass windows located within Regency Mall in Racine, WI. The name "Lee NAILS" appears above the entrance to the business in the mall's interior.

109.    **4879A S. 27th Street, Greenfield, WI.** This is the location of Nail's Fashion, a business owned and operated by VU Nguyen and is more specifically described as a storefront located in a "strip" mall on the west side of S. 27th St. between Barnard Av. and Carpenter Av. The building is white with blue trim and a flat roof. The name "Nail's Fashion" appears on a sign above the front windows of the business. The numbers "4879A" appear on the north side of the building above the front door.

110.    **1033 N. Old World Third Street, #301, Milwaukee, WI.** This is Sourideth JOE Chansomphou's current residence and is more specifically described as an apartment within a five-story, tan brick building with the bar/restaurant "Tutto" located on the first floor. The

63

Case 2:11-mj-00848-NJ    Filed 07/01/11    Page 64 of 76    Document 1

numbers "1033" appear on an awning on the east side of the building and on an awning above a door on the west side of the building. The doorbells for the apartments within the building are next to the door on the west side of the building.

## VII.   CONCLUSION

111.   Based on the facts contained within this affidavit, I believe there is probable cause to believe that located within the above described locations, there is evidence of drug distribution and illegal gambling activities, as detailed in Attachment A (Items to be Seized), in violation of Title 21, United States Code, Sections 841(a)(1) (possession with the intent to distribute and distribute controlled substances), 846 (conspiracy to possess with the intent to distribute and distribute controlled substances), and 843(b) (use of communications facilities to facilitate controlled substance felonies); and Title 18, United States Code, Sections 1084 (transmission of waging information), 1952 (interstate travel or transportation in aid of racketeering enterprises), 1955 (prohibition illegal gambling business), and 1956 and 1957 (money laundering).

64

# Appendix A
## Target Telephone T-III Orders

| Target Telephone | User | Date of Order | Date Ended[1] |
|---|---|---|---|
| MILWAUKEE TARGET TELEPHONES | | | |
| MTT12 – 414-324-6110 | HOA | November 1, 2010 | November 30, 2010 |
| MTT12 – First Extension | HOA | December 10, 2010 | January 8, 2011 |
| MTT13 – 414-324-7409 | HOA | November 1, 2010 | November 30, 2010 |
| MTT13 – First Extension | HOA | December 10, 2010 | January 8, 2011 |
| MTT13 – Second Extension | HOA | January 11, 2011 | Monitoring not initiated |
| MTT18 – 414-491-7313 | VU | December 10, 2010 | January 8, 2011 |
| MTT18 – First Extension | VU | January 11, 2011 | February 10, 2011 |
| MTT18 – Second Extension | VU | February 15, 2011 | March 16, 2011 |
| MTT18 – Third Extension | VU | March 25, 2011 | April 23, 2011 |
| MTT33 – 414-736-3094 | VU | January 21, 2011 | February 19, 2011 |
| MTT33 – First Extension | VU | February 22, 2011 | March 23, 2011 |
| MTT33 – Second Extension | VU | March 25, 2011 | April 23, 2011 |
| MTT34 – 414-306-1749 | HOA | January 21, 2011 | February 19, 2011 |
| MTT34 – First Extension | HOA | February 22, 2011 | March 23, 2011 |
| MTT34 – Second Extension | HOA | March 25, 2011 | April 23, 2011 |
| SEATTLE TARGET TELEPHONES | | | |
| STT1 - 425-314-6832 | IMA and YIM | March 29, 2010 | Extended |
| STT1 First Extension | IMA and YIM | April 27, 2010 | May 13, 2010 |
| STT5 - 206-453-9065 | YIM | May 18, 2010 | Extended |
| STT5 First Extension | YIM | June 14, 2010 | Extended |
| STT5 Second Extension | YIM | July 13, 2010 | Extended |
| STT5 Third Extension | YIM | August 9, 2010 | Extended |

---

1 This column includes the approximate date on which ongoing interceptions will expire if the wiretap is not extended.

# Appendix A
## Target Telephone T-III Orders

| | | | |
|---|---|---|---|
| STT5 Fourth Extension | YIM | September 9, 2010 | October 7, 2010 |
| STT6 – 206-245-9116 | IMA | May 18, 2010 | June 8, 2010 |
| STT7 – 206-432-1509 | YIM | May 28, 2010 | June 25, 2010 |
| STT7 – First Extension | YIM | July 13, 2010 | Not Initiated |
| STT8 – 206-291-7372 | IMA | June 29, 2010 | July 11, 2010 |
| STT8 – First Extension | IMA | September 24, 2010 | October 27, 2010 |
| STT9 – 206-371-2309 | YIM | June 15, 2010 | Extended |
| STT9 – First extension | YIM | July 13, 2010 | Extended |
| STT9 – Second extension | YIM | August 9, 2010 | Extended |
| STT9 – Third extension | YIM | September 9, 2010 | Extended |
| STT9 – Fourth Extension | YIM | October 7, 2010 | November 7, 2010 |
| STT9 – Fifth Extension | YIM | November 9, 2010 | Extended |
| STT9 – Sixth Extension | YIM | December 8, 2010 | Extended |
| STT9 – Seventh Extension | YIM | December 29, 2010 | Extended |
| STT9 – Eighth Extension | YIM | January 27, 2011 | February 25, 2011 |
| STT12 – 206-375-8033 | YIM | June 29, 2010 | July 28, 2010 |
| STT12 – First Extension | YIM | December 3, 2010 | Extended |
| STT12 – Second Extension | YIM | December 29, 2010 | Extended |
| STT12 – Third Extension | YIM | January 27, 2011 | Extended |
| STT12 – Fourth Extension | YIM | February 25, 2011 | Extended |
| STT12 – Fifth Extension | YIM | March 14, 2011 | April 12, 2011 |
| STT14 – 503-519-7220 | JOHN TRAN2 | July 19, 2010 | Extended |
| STT14 – First Extension | JOHN TRAN | August 9, 2010 | September 2, 2010 |
| STT16 – 206-697-3871 | YIM | August 26, 2010 | September 23, 2010 |
| STT18 – 206-391-5440 | CAMACHO3 | August 12, 2010 | Extended |

2 JOHN TRAN is believed to be a drug trafficking associate of YIM, but agents do not believe he is directly involved with the Wisconsin DTO.

3 RUBEN CAMACHO-CONTRERAS is believed to be a drug trafficking associate of YIM, but agents do not believe he is directly involved with the Wisconsin DTO.

# Appendix A
# Target Telephone T-III Orders

| | | | |
|---|---|---|---|
| STT18 – First Extension | CAMACHO | September 9, 2010 | Extended |
| STT18 – Second Extension | CAMACHO | October 6, 2010 | November 5, 2010 |
| STT18 – Third Extension | CAMACO | November 9, 2010 | Extended |
| STT18 – Fourth Extension | CAMACHO | December 8, 2010 | December 19, 2010 |
| STT20 – 206-697-6193 | YIM | July 23, 2010 | Extended |
| STT20 – First Extension | YIM | August 9, 2010 | September 8, 2010 |
| STT21 – 206-375-7410 | YIM | July 23, 2010 | Extended |
| STT21 – First Extension | YIIM | August 9, 2010 | August 20, 2010 |
| STT24 – 651-338-7875 | JOHN TRAN | September 3, 2010 | October 3, 2010 |
| STT24 – First Extension | JOHN TRAN | October 7, 2010 | November 3, 2010 |
| STT25 – 206-397-2759 | YIM | October 6, 2010 | November 7, 2010 |
| STT25 – First Extension | YIM | November 9, 2010 | December 9, 2010 |
| STT32 – 206-458-5083 | YIM | November 3, 2010 | Extended |
| STT32 – First Extension | YIM | December 3, 2010 | Extended |
| STT32 – Second Extension | YIM | December 29, 2010 | Extended |
| STT32 – Third Extension | YIM | January 27, 2011 | Extended |
| STT32 – Fourth Extension | YIM | February 25, 2011 | Extended |
| STT32 – Fifth Extension | YIM | March 14, 2011 | Extended |
| STT32 – Sixth Extension | YIM | April 11, 2011 | May 9, 2011 |
| STT32 – Seventh Extension | YIM | May 9, 2011 | June 7, 2011 |
| STT38 – 206-631-0739 | YIM | December 3, 2010 | January 2, 2011 |
| STT40 – 206-372-0159 | YIM | December 27, 2010 | January 24, 2011 |
| STT44 – 720-280-9337 | CAMACHO | February 17, 2011 | March 6, 2011 |
| STT46 – 206-779-4263 | YIM | February 9, 2011 | March 10, 2011 |
| STT46 – First Extension | YIM | March 14, 2011 | April 12, 2011 |
| STT50 - 360-410-6165 | FNU LNU aka Chebo | March 23, 2011 | Extended |
| STT50 – First Extension | FNU LNU aka Chebo | April 15, 2011 | May 9, 2011 |

## Appendix A
## Target Telephone T-III Orders

| | | | |
|---|---|---|---|
| STT53 – 206-778-1203 | YIM | March 7, 2011 | April 5, 2011 |
| STT53 – First Extension | YIM | April 11, 2011 | Extended |
| STT53 – Second Extension | YIM | May 9, 2011 | June 7, 2011 |
| STT55 – 206-790-2165 | IMA | March 7, 2011 | April 5, 2011 |
| STT55 – First Extension | IMA | April 11, 2011 | May 9, 2011 |
| STT63 - 559-352-6584 | FNU LNU | May 6, 2011 | June 4, 2011 |
| LOS ANGELES TARGET TELEPHONES | | | |
| LATT1 – 714-443-1936 | TRINH | August 4, 2010[4] | September 9, 2010 |
| LATT1 – First Extension | TRINH | September 16, 2010 | October 15, 2010 |
| LATT1 – Second Extension | TRINH | October 26, 2010[5] | November 24, 2010 |
| LATT1 – Third Extension | TRINH | January 6, 2011 | February 4, 2011 |
| LATT2 – 714-936-5766 | PHAN | September 16, 2010 | October 15, 2010 |
| LATT2 – First Extension | PHAN | October 26, 2010[6] | November 2, 2010 |
| LATT3 – 619-302-1394 | TRINH | October 26, 2010[7] | November 24, 2010 |
| LATT3 – First Extension | TRINH | January 6, 2011 | February 4, 2011 |
| LATT4 – 949-254-6348 | FNU LNU | October 26, 2010[8] | November 10, 2010 |
| LATT5 – 714-260-8734 | LY | October 26, 2010[9] | November 10, 2010 |
| LATT6 – 714-247-9251 | PHAN | January 6, 2011 | February 4, 2011 |
| LATT7 – 714-812-8008 | TRINH | January 6, 2011 | February 4, 2011 |
| LATT8 – 714-487-3137 | BO | January 6, 2011 | February 4, 2011 |
| LATT9 – 651-278-5938 | LY | January 6, 2011 | February 4, 2011 |

---

4 Was not activated until August 11, 2010.
5 Activated October 27, 2010.
6 Activated October 27, 2010.
7 Activated October 27, 2010.
8 Activated October 27, 2010.
9 Activated October 27, 2010.

# APPENDIX B - Photographs of Search Locations

**5728 Evarit Drive, Racine, WI.** This is the location of HOA Nguyen's current residence and is more specifically described as a tan and brown brick, two-story, single-family residence with a brown roof located on the north side of Evarit Dr. east of Elwood Dr. The numbers 5728 appear above the garage door on the south side of the building.



**40 E. Fieldstone Court. #8, Oak Creek, WI.** This is VU Nguyen's current residence and is more specifically described as a unit within an 8-unit townhome building with gray siding, white trim and a gray roof. The number "40" appears on a blue, diamond-shaped sign in front of the building. Unit #8 is the furthest east unit and is a three-story unit with a garage on the first floor. The number "8" appears on a door on the east side of the building.



**5758 Durand Avenue, Racine, WI.** This is the location of Lee Nails salon, a business owned and operated by HOA Nguyen and is more specifically described as a storefront with glass windows located within Regency Mall in Racine, WI. The name "Lee NAILS" appears above the entrance to the business in the mall's interior.



**4879A S. 27th Street, Greenfield, WI.** This is the location of Nail's Fashion, a business owned and operated by VU Nguyen and is more specifically described asa storefront located in a "strip" mall on the west side of S. 27th St. between Barnard Av. and Carpenter Av. The building is white with blue trim and a flat roof. The name "Nail's Fashion" appears on a sign above the front windows of the business. The numbers "4879A" appear on the north side of the building above the front door.



**1033 N. Old World Third Street, #301, Milwaukee, WI.** This is Sourideth JOE Chansomphou's current residence and is more specifically described as an apartment within a five-story, tan brick building with the bar/restaurant "Tutto" located on the first floor. The numbers "1033" appear on an awning on the east side of the building and on an awning above a door on the west side of the building. The doorbells for the apartments within the building are next to the door on the west side of the building.



# ATTACHMENT A - Items to Be Seized

1.      Paraphernalia associated with the manufacture and distribution of controlled substances, including but not limited to scales and other measuring devices, packaging materials, containers to hold controlled substances, and documents related to the manufacture, harvesting, distribution, sale, or possession of controlled substances.

2.      Duffel bags, suitcases, plastic containers, shipping boxes, or other containers used to hold, ship, or transport controlled substances.

3.      Proceeds of drug trafficking and illegal gambling activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities and illegal gambling activities.

4.      Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, UPS, FedEx, and other mail service receipts and records, bank statements, safes, safe deposit box keys and records, storage location keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of drug trafficking and illegal gambling activities, or financial transactions related to drug trafficking and illegal gambling activities.

5.      Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed lists of customers and related identifying information; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions.

6.      Money ledgers, bettor lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the date, time, team, odds, and dollar amounts of wagers, and/or concealed lists of bettors and related identifying information; types, amounts, and dates of wagers made as well as dates, places, and amounts of specific pay-off transactions

7.      Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, e-mails, documents and other items or lists reflecting names, addresses, telephone numbers, addresses, and any communications regarding illegal activities among and between members and associates involved in drug trafficking and illegal gambling activities.

8.      Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities.

9.      Cellular telephones, SmartPhones, pagers, text messaging systems, and other communication devices, including devices capable of sending, receiving, or storing e-mails, and any and all records associated with such communications services.

10.     Records, items and documents reflecting travel for the purpose of participating in drug trafficking and illegal gambling activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel.

11.     Indicia of occupancy, residency, or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents, and keys.

12.     Photographs, videotapes or other depictions of assets, coconspirators, controlled substances, or other activities related to drug trafficking and illegal gambling activities.

13.     Any computers or electronic media that were or may have been used as a means to commit the offenses described on the warrant. For any computer hard drive or other electronic media (hereinafter, "MEDIA") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

      a.     evidence of user attribution showing who used or owned the MEDIA at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history;

      b.     passwords, encryption keys, and other access devices that may be necessary to access the MEDIA; and

      c.     documentation and manuals that may be necessary to access the MEDIA or to conduct a forensic examination of the MEDIA.

14.     Records and things evidencing the use of the Internet to communicate, including routers, modems, and network equipment used to connect computers to the Internet; records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

15.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

# ATTACHMENT B
## ADDENDUM TO SEARCH WARRANT

In searching for data capable of being read stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

1. Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices (collectively the "computer devices") to determine whether the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the computer devices.

2. If the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, they will be searched on-site, and a computer device will be seized only if the search reveals it to contain any data that falls within the list of items to be seized set forth herein.

3. If the computer devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the computer devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

4. In searching the computer devices, the computer personnel may examine all of the data contained in the computer devices to view items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

5. If the computer personnel seize the computer devices, the computer personnel will search the computer devices or data images within a reasonable amount of time not to exceed **30 days** from the date of execution of the warrant. If, after conducting such a search, the case agents determine that a computer device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the computer device; otherwise, the government will return the computer device. If the government establishes a need for additional time to determine whether the data on the computer devices falls within any of the items to be seized pursuant to this warrant, it may seek an extension of the time period from the court within the original thirty day period from the date of execution of the warrant.

6. In conducting the search authorized by this warrant, whether performed on site or in a laboratory, or other controlled environment, the government shall make reasonable efforts to utilize computer search methodology to search for only files, documents or other electronically stored information which are identified in the warrant itself and any attachments thereto.

The search methodology may include, but is not limited to, the following techniques:

(a) surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

(b) "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

(c) "scanning" storage areas to discover and possibly recover recently deleted data;

(d) "scanning" storage areas for deliberately hidden files; or

(e) performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

(f) performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in _____.

(g) This warrant and this search procedure specifically excludes a search of any kind of unopened electronic mail, except as authorized in _____. No search of unopened electronic mail shall be conducted without a separate search warrant supported by probable cause. Appropriate efforts shall be made to minimize the disclosure of records and other information which are not the subject of this warrant.